**UNITED STATES of America ex rel. Craig S. OWEN, Petitioner-Appellee,**

v.

**Hon. Daniel J. McMANN, Warden of Auburn State Prison, Auburn, New York, Respondent-Appellant.**

**No. 133, Docket 34822.**

United States Court of Appeals, Second Circuit.

Argued Oct. 21, 1970.

Decided Dec. 8, 1970.

Brenda Soloff, New York City (Louis J. Lefkowitz, Atty. Gen. of N. Y., Samuel A. Hirshowitz, First Asst. Atty. Gen., and Iris A. Steel, Asst. Atty. Gen., of counsel), for respondent-appellant.

Richard N. Bach, Utica, N. Y., for petitioner-appellee.

Before WATERMAN, Senior Circuit Judge, and FRIENDLY and FEINBERG, Circuit Judges.

FRIENDLY, Circuit Judge:

Petitioner Craig S. Owen was tried early in 1966 in the County Court of Oneida County, N. Y., with one Sebregandio, on charges of first degree robbery, second degree assault and first degree grand larceny. After some 13 to 14 hours of deliberation and a report of inability to agree with respect to one defendant, the jury returned to the courtroom around 2 A.M. and the foreman reported both defendants had been found guilty on all counts. When the jury was being polled with respect to Owen, one juror, Thomas S. Kassouf, inquired whether it was possible to convict only of grand larceny "or do we have to have the whole three?" When the judge declined to discuss the matter, Kassouf endorsed the foreman's report. Evidently sensing that something might be amiss, Owen's attorney, Mr. Tierney, obtained an affidavit from Kassouf. In addition to claiming that the foreman, Mr. Jeffrey, had told the jury that it had to find the defendants guilty on all three

charges or none [1] but that he and several other jurors had voted to convict on the grand larceny charge alone, Kassouf averred that Jeffrey and two other jurors, Mrs. Janak and Mrs. Taurisano, informed the other jurors that they "knew all about" Craig Owen, and referred to unfavorable incidents in Owen's life which were entirely unrelated to the charge. Another juror, Mr. Tucker, made an affidavit that these same three jurors "informed the jury that they knew various things about Craig Owen and that they had reason to believe from outside information that he was guilty."

At the time of sentence, Mr. Tierney submitted Kassouf's and Tucker's affidavits in support of a motion for a new trial. This was denied. On appeal, Owen challenged the propriety of the alleged infiltration of extra-record evidence into the jury's deliberations, but the Appellate Division affirmed without opinion, People v. Owen, 28 A.D.2d 824, 282 N.Y.S.2d 721 (4th Dept. 1967),[2] and a judge of the Court of Appeals denied leave to appeal. After the second decision in People v. DeLucia, 20 N.Y.2d 275, 279, 282 N.Y.S.2d 526, 530, 229 N.E.2d 211 (1967), seemingly repudiating the New York rule against jurors' impeachment of their verdict in the case of "inherently prejudicial 'outside influences,'" Owen applied for reconsideration of the denial of leave to appeal, but without success.

Owen's petition for federal habeas in the District Court for the Northern District of New York contended, *inter alia*, that he had been convicted on less than a unanimous verdict and had been deprived of his Sixth Amendment right to confrontation by the jury's considering extra-record statements about him by three jurors. Finding the state record insufficient to enable him to dispose of these issues, Judge Port conducted an evidentiary hearing. Kassouf and Tucker testified along the lines of their post-trial affidavits; a third juror, Shultz, stated only that some juror had said that "Owen's father was always getting him out of trouble." Mr. Jeffrey denied having made or heard any adverse statement, save only that one juror (evidently Mrs. Janak, whose husband was an investigator) had commented that Owen, while a member of the Utica Police Department, had taken a prowl car outside the city limits. Mrs. Janak and Mrs. Taurisano denied having made or heard any comments on matters not in evidence. Upon the basis of the testimony, the court found:

In substance, the jurors or some of them were told by other jurors during the trial and the deliberations: that the defendant had been in trouble all his life; that he had been suspended from the police force in connection with the unauthorized use of a prowl car; that he had been involved in a fight in a tavern; that one of the juror's husband was an investigator and that he knew all about plaintiff's background and character, which was bad; and that petitioner's father was always getting him out of trouble.

Concluding that in consequence Owen had been deprived of his Sixth Amendment right of confrontation, therefore making it unnecessary to deal with the

---

1. Kassouf also claimed that he requested Mr. Jeffrey to ask the judge for instructions on this point but that Jeffrey refused to do so.

2. Very likely this was on the basis of the initial ruling in People v. DeLucia, 15 N.Y.2d 294, 296, 258 N.Y.S.2d 377, 378, 206 N.E.2d 324, 324, cert. denied 382 U.S. 821, 86 S.Ct. 50, 15 L.Ed.2d 67 (1965), that "jurors may not impeach their own duly rendered verdict by statements or testimony averring their own misconduct within or without the juryroom; much less can they do so by statements presented in the form of hearsay affidavits." However, we must reiterate previous expressions of regret that in New York prisoner cases raising constitutional claims as substantial as this one, we do not have the benefit of a considered statement, however brief, by a New York appellate court. A quite different case would be presented, for example, if the trial judge or the Appellate Division had indicated disbelief in the affidavits filed.

claim of a less than unanimous verdict, the judge set aside Owen's convictions and ordered his discharge, unless the State retried him within 60 days, this period to be extended pending any appeal. The State has appealed.

Although the findings went to the verge permitted by the evidence at the post-trial hearing, the State does not and could not properly ask us to reject them as clearly erroneous. It contends rather that, accepting them, we should reverse as a matter of law.

Both parties recognize Parker v. Gladden, 385 U.S. 363, 87 S.Ct. 468, 17 L. Ed.2d 420 (1966), to be the starting point for discussion. That case makes it plain that if a bailiff testified he had entered the jury room and had made statements such as the district court found were here made by jurors about Owen, the confrontation clause of the Sixth Amendment and the due process clause of the Fourteenth would require a judgment of conviction to be set aside. We think the result would be the same if a non-juror, who was neither a court officer nor a witness, admitted to having made such statements to the jury here. To be sure, in rejecting Oregon's argument in *Parker* that no harm could have resulted, the Court said, 385 U.S. at 365, 87 S.Ct. at 470:

> This overlooks the fact that the official character of the bailiff—as an officer of the court as well as the State —beyond question carries great weight with a jury which he had been shepherding for eight days and nights.

Cf. Remmer v. United States, 347 U.S. 227, 229–230, 74 S.Ct. 450, 98 L.Ed. 654 (1954). But that was written in a context where the bailiff's remarks were only an unsupported statement of opinion, "that wicked fellow * * * is guilty," and an assurance that any error by the jury in finding him so would be corrected by the Supreme Court. The Court might well have thought that if such statements had been made by a person who was neither a witness, cf.

Turner v. Louisiana, 379 U.S. 466, 85 S. Ct. 546, 13 L.Ed.2d 424 (1965), nor an official, they would not have been weighty enough to constitute a prejudicial violation of a defendant's rights under the confrontation or due process clauses, *per contra* when made by an official, however lowly. The statements here found to have been made were sufficiently more damaging to Owen than the remarks of the "apparently Elizabethan-tongued bailiff" in *Parker*, 385 U. S. at 367, 87 S.Ct. 468 (dissenting opinion of Harlan, J.), that the added factor of official utterance would not be required to show prejudice.

If our analysis is correct up to this point, we must affirm unless (1) it makes a legally significant difference that the remarks here were by jurors rather than the hypothetical non-juror or (2) New York may lawfully rule out jurors' testimony as a source of proof of the facts here alleged or (3) petitioner has waived his rights.

Consideration of the first point takes us back to the jury's earliest days. The thirteenth century jury was selected not because of its ignorance but because of its knowledge. "The decision upon questions of fact was left to them because they were already acquainted with them, or if not already so acquainted with them, because they might easily acquire the necessary knowledge." 1 Holdsworth, A History of English Law 317 (3d ed. 1922). See also 2 Pollock & Maitland, The History of English Law 624–27 (2d ed. 1898). Members of the presenting jury were allowed to be members of the petty jury until a mid-14th century statute permitted challenge in cases of trespass or felony, 25 Edw. III, St. 5, c. 3 (1351–52). It was only gradually that the character of the petty jury changed. By 1468 Sir John Fortescue was "able to regard the jury as a body of impartial men who come into court with an open mind; instead of finding the verdict out of their own knowledge of the events, the parties or their counsel in open court present their evidence to the jury, and witnesses are

examined upon oath." However, "jurors were still allowed to use their own knowledge in reaching a verdict, and might reach a verdict although no witnesses and no evidence had been produced." Plucknett, A Concise History of the Common Law 129–30 (5th ed. 1956). Another four centuries were to elapse before Parliament provided in 1856 that a jury "trial could be moved to the Central Criminal Court if it was feared that a local jury would not be impartial." *Id.* at 128.

The twentieth century American jury has moved a long way from its medieval origins. Today's juror must be "indifferent" and "[h]is verdict must be based upon the evidence developed at the trial." Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). See also Patterson v. Colorado, 205 U.S. 454, 462, 27 S.Ct. 556, 51 L.Ed. 879 (1907). Still we would not lightly assume that the jury's original role as the voice of the country may not sufficiently persist that neither the specific guarantees of an impartial jury and of confrontation nor the more general one of due process would be violated simply because jurors with open minds were influenced to some degree by community knowledge that a defendant was "wicked" or the reverse,[3] even though this was not in evidence. See Irvin v. Dowd, *supra*, 366 U.S. at 722–723, 81 S. Ct. 1639. One, although by no means the only, purpose of the insistence on trial in the vicinage both in Article III, § 2, and in the Sixth Amendment, must have been to entitle a defendant to trial where he is known—and this may sometimes work against him rather than in his favor. Indeed there are still sections of the country where it might be impossible to find twelve jurors who were totally ignorant about a defendant. Moreover, to allow verdicts to be attacked merely for casual jury-room references on the basis of matters not in evidence would add unduly to the already fragile state of criminal convictions. See Unit-ed States v. McKinney, 429 F.2d 1019, 1031–1032 (5 Cir. 1970) (dissenting opinion of Judge Godbold). As Mr. Justice Clark observed, dissenting in Rideau v. Louisiana, 373 U.S. 723, 733, 83 S.Ct. 1417, 1423, 10 L.Ed.2d 663 (1963), "it is an impossible standard to require that tribunal [the jury] to be a laboratory, completely sterilized and freed from any external factors."

While Parker v. Gladden, *supra*, consistently with the precedents it cites, demonstrates the Court's continuing concern with protecting a criminal defendant from the possibility of a verdict based on a consideration of facts not properly before the jury, it is thus not automatically determinative when the extra-record remarks are by jurors themselves. The invocation of the confrontation clause in *Parker* was entirely appropriate to shield the defendant from comments to the jury by one whose statements, if admissible at all, could have properly been received only from the witness stand, subject to the procedural safeguards which the Sixth Amendment requires. But, so far as we know, the Court has never suggested that jurors, whose duty it is to consider and discuss the factual material properly before them, become "unsworn witnesses" within the scope of the confrontation clause simply because they have considered any factual matters going beyond those of record. To resort to the metaphor that the moment a juror passes a fraction of an inch beyond the record evidence, he becomes "an unsworn witness" is to ignore centuries of history and assume an answer rather than to provide the basis for one.

Although accurate knowledge of what goes on in the jury room is unhappily limited, see Kalven and Zeisel, The American Jury vi–vii (1966), we suspect there are many cases where jurors make statements concerning the general credibility or incredibility of the police, the need of backing them up even when there is reasonable doubt of guilt or put-

---

3. In saying this we assume the jurors made truthful answers to questions on the *voir dire.*

ting brakes upon them even when there is none, the desirability of overcoming reasonable doubt because of the repugnance of particular crimes or of yielding to less than reasonable doubt because of their insignificance, and concerning other matters that would invalidate a judgment if uttered by a judge, see *id.* at 131–32.[4] Yet this is the very stuff of the jury system, and we have recognized, in a not unrelated context, that the standards for judges and juries are not the same, United States v. Maybury, 274 F.2d 899, 902–903 (2 Cir. 1960). The touchstone of decision in a case such as we have here is thus not the mere fact of infiltration of some molecules of extra-record matter, with the supposed consequences that the infiltrator becomes a "witness" and the confrontation clause automatically applies, but the nature of what has been infiltrated and the probability of prejudice. See, e. g., Rideau v. Louisiana, *supra,* 373 U.S. at 727, 83 S.Ct. 1417; Estes v. Texas, 381 U.S. 532, 542–543, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Sheppard v. Maxwell, 384 U.S. 333, 351–352, 86 S. Ct. 1507, 16 L.Ed.2d 600 (1966); United States v. Crosby, 294 F.2d 928, 950 (2 Cir. 1961), cert. denied sub nom. Mittelman v. United States, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962).

■ On the basis of Judge Port's findings, we think that in this case there was "such a probability that prejudice will result that it [the verdict] is deemed in-

herently lacking in due process." Estes v. Texas, *supra,* 381 U.S. at 542–543, 85 S.Ct. at 1633. To be sure, there is no "litmus paper test" for making such a determination. But a good definition of the right line has recently been drawn by Judge Goldberg in United States v. McKinney, 429 F.2d 1019, 1022–1023 (5 Cir. 1970):

All must recognize, of course, that a complete sanitizing of the jury room is impossible. We cannot expunge from jury deliberations the subjective opinions of jurors, their additudinal expositions, or their philosophies. These involve the very human elements that constitute one of the strengths of our jury system, and we cannot and should not excommunicate them from jury deliberations. Nevertheless, while the jury may leaven its deliberations with its wisdom and experience, in doing so it must not bring extra *facts* into the jury room. In every criminal case we must endeavor to see that jurors do not [consider] in the confines of the jury room * * * specific facts about the specific defendant then on trial. * * * To the greatest extent possible all factual [material] must pass through the judicial sieve, where the fundamental guarantees of procedural law protect the rights of those accused of crime.[5]

Owen's case falls on the impermissible side of this by no means bright line, al-

4. A few instances are reported in Broeder, The Impact of the Vicinage Requirements: An Empirical Look, 45 Nebr.L. Rev. 99, 106–09 (1966), and in Miller v. United States, 403 F.2d 77, 84 n. 12 (2 Cir. 1968).

5. While the rule in *McKinney* was arguably established under the court's supervisory powers rather than as a matter of due process, neither the opinion nor the authorities there cited indicate that any such distinction was intended and we do not believe it properly could have been. We have slightly modified the excerpt quoted in the text, so as to eliminate any suggestion that jurors become "witnesses," with consequent automatic entailment of the confrontation clause,

whenever a juror voices any extra-record facts. Indeed the *McKinney* court was careful to point out that the inquiry of the jurors on the remand was to be limited to the factual issue whether a discussion of facts outside the record did take place, but that the "trial court itself must decide the question of prejudice on the basis of an independent evaluation of all the circumstances of the case." 429 F.2d at 1030. In short, the inquiry is not whether the jurors "became witnesses" in the sense that they discussed *any* matters not of record but whether they discussed specific extra-record *facts* relating to the defendant, and if they did, whether there was a significant possibility that the defendant was prejudiced thereby.

though perhaps not by much. On the basis of the judge's findings, the jurors' statements went beyond Owen's being something of a ne'er-do-well; they included allegations of at least two specific incidents which had not been and probably could not have been received in evidence, and which Owen had had no opportunity to refute.

We thus reach the second asserted basis of distinction from the statements by a hypothetical non-juror with which we began, namely, that the evidence came from the jurors themselves. The State could not seriously contend that even if Owen were denied due process by virtue of the jury's consideration of prejudicial extra-record facts, New York law may independently foreclose him from challenging his conviction on federal constitutional grounds, cf. Henry v. Mississippi, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965), and we do not understand it to be making such a contention. Rather, the State argues that we should be mindful of the compelling public policy considerations, emphasized by the Supreme Court, which underlie the general rule against jurors' impeachment of their own duly rendered verdict:

> [L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed * * * in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation; to the destruction of all frankness and freedom of discussion and conference.

McDonald v. Pless, 238 U.S. 264, 267–268, 35 S.Ct. 783, 784, 59 L.Ed. 1300 (1915). Since the sole proof of prejudice in the instant case comes from the post-trial interrogation of the jurors with respect to what transpired during their deliberations, and since New York evidence law, following the famous decision of Lord Mansfield, Vaise v. Delavel, 1 T.R. 11 (K.B. 1785), has allegedly embraced this policy by clamping a tight seal on jurors' revealing what they heard in the jury room, Dana v. Tucker, 4 Johns. R., N.Y., 487, 488 (1809); Clum v. Smith, 5 Hill, N.Y., 560, 561 (1843); Williams v. Montgomery, 60 N.Y. 648 (1875), we are urged to refrain from carving an exception to a rule which, it is argued, represents a firmly imbedded policy of both New York State and federal courts.

While we have taken note of this policy, Miller v. United States, 403 F.2d 77, 82 (2 Cir. 1968), we have also recognized, United States v. Crosby, *supra*, 294 F.2d at 949–950, following the Supreme Court in Mattox v. United States, 146 U.S. 140, 149, 13 S.Ct. 50, 36 L.Ed. 917 (1892), that the prohibition is not an absolute. Indeed, as indicated above, we should have thought that the New York State evidence rule, so far as here relevant, had been eliminated by the second decision in People v. DeLucia, *supra*, 20 N.Y.2d 275, 282 N.Y.S.2d 526, 229 N.E.2d 211. We would read Judge Keating's opinion as in effect adopting for New York the rule of Woodward v. Leavitt, 107 Mass. 453, 466 (1871), approved in Mattox v. United States, *supra*, 146 U.S. at 149, 13 S.Ct. at 53, that "a juryman may testify to any facts bearing upon the question of any extraneous influence, although not as to how far that influence operated upon his mind," [6] with "extraneous" including

---

6. Although we believe this to be the proper rule, see United States v. Crosby, *supra*, 294 F.2d at 949–950, we do not underestimate its difficulties of application.

The testimony taken in this very case drifted, almost inevitably, from what the jurors allegedly said to what its effect had been. This is a further consideration

misconduct by the jurors themselves. The distinction asserted by the State, that in *DeLucia* the jurors were testifying to misconduct outside the jury room, to wit, an unsupervised viewing of the scene of the crime by some of them, whereas here the misconduct was inside, will not wash. In the first place, it makes no sense, see State v. Kociolek, 20 N.J. 92, 100, 118 A.2d 812, 816 (1955) (Brennan, J.); Proposed Rules of Evidence for the United States District Courts and Magistrates, § 6–06(b) and p. 119 (1969). The State's approving citation of United States v. Crosby, *supra*, 294 F.2d 949–950 (2 Cir.), indicates it would not assert that while a juryman could testify he had read a newspaper article with extra-record information outside the jury room, he could not reveal his communication of it to other jurors within that sanctum. There is no rational distinction between the potentially prejudicial effect of extra-record information which a juror enunciates on the basis of the printed word and that which comes from his brain. As we pointed out in United States v. Crosby, *supra*, 294 F.2d at 950, it is the "nature of the matter and its probable effect on a hypothetical average jury," not the source of the information or the locus of its communication, which determines whether the defendant has been prejudiced. In the second place, the distinction would not explain *DeLucia* itself, since as appears from this court's opinion in United States ex rel. DeLucia v. McMann, 373 F.2d 759, 761 (2 Cir. 1967), the jurors' affidavits related to events inside as well as outside the jury room and the New York Court of Appeals drew no distinction on that score. However, if we were to take the inscrutable silence of the state courts to mean what the Attorney General says it does, we would be obliged to disregard a state evidentiary rule preventing what in this case is the only method of proving that the defendant had been denied due process by the jury's consideration of prejudicial extra-record facts. Cf. American Ry. Exp. Co. v. Levee, 263 U.S. 19, 21, 44 S.Ct. 11, 68 L.Ed. 140 (1923). We intimated as much in *DeLucia, supra*, 373 F.2d at 762. We would reach the same result if the supposed New York rule barring a juror's statement about improper statements within the jury room were viewed as being cast in terms of privilege.[7]

■ It remains only to consider the State's claim that Owen waived his right to complain of the jurors' misconduct by failing to object to the jury's containing persons who might avail themselves of knowledge about him *dehors* the record. Here we suffer from the handicap that all efforts to find the transcript of the

weighing in favor of a rather narrow definition of the kind of statement by a juror that will afford basis for invalidating a verdict.

7. Wigmore states, 8 Evidence § 2346, p. 678 (McNaughton rev. 1961) that *"a juror is privileged not to have his communications to a fellow juror* [during retirement] *disclosed* upon the witness stand against his consent." The language and most of the citations bear upon the case where the juror is proceeded against for contempt, perjury, or obstruction of justice, as in Clark v. United States, 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993 (1933), although what Wigmore calls Mr. Justice Cardozo's "eloquent exposition of the policy" of the supposed privilege in that case seems in fact to leave little but the name. However, when Wigmore comes to impeachment of the verdict as such, while vigorously attacking Lord Mansfield's rule as, among other things, tempting the parties "to seduce the bailiffs to tricky expedients and surreptitious eavesdroppings," *id.* at § 2353, p. 699, he also says that the privilege would apply "if the juror to be informed against should claim it," *id.* at § 2352, p. 695. Hence, as a practical matter, impeachment for misconduct in the jury room could be had only when the juror guilty of misconduct confessed. We find it hard to see how when a verdict is attacked by juror A's testimony about what juror B said or did in the jury room, the government has standing to invoke whatever privilege juror B may possess; whether juror B is privileged to have juror A's testimony excluded in a proceeding against him is another matter.

*voir dire* of the jurors have been unsuccessful. At the hearing in the district court, Mr. Tierney, Owen's attorney, testified that he asked the jurors whether they knew Owen or his family, whether they knew of any reason why in fairness to the defendant they could not sit, and whether anything they had discussed or read would affect or prejudice their deliberations. All these questions elicited negative responses except in the case of Mr. Jeffrey, who said he knew Owen casually but that this would not affect his judgment. Mr. Jeffrey confirmed that Mr. Tierney had asked whether he knew Owen and that he acknowledged a casual acquaintance which, according to Jeffrey's post-trial testimony, was due to a single meeting at a testimonial dinner. Mrs. Janak testified that Tierney had asked whether she knew Owen and she had replied in the negative, which was true, although perhaps not quite the whole truth since she did know something about him. While counsel may have been at fault in not asking more directly whether the jurors knew anything concerning Owen that would affect their judgment, the State has not sustained its burden of showing that the defense consented that the jurors who were to try Owen could bring into the jury room specific factual material about him that was derived solely from their personal lives rather than the evidence adduced at trial.

Affirmed.