No.  95-176

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

STATE OF MONTANA,

      Plaintiff and Respondent,

   v.

DAVID GIRARD KELMAN,

      Defendant and Appellant.

FILED

APR 23 1996

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Twelfth Judicial District,
In and for the County of Hill,
The Honorable John Warner, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

            Stephen J. Nardi, Sherlock & Nardi,
Kalispell, Montana

      For Respondent:

            Hon. Joseph P. Mazurek, Attorney General,
Kathy Seeley, Assistant Attorney General,
Helena, Montana

            David G. Rice, Hill County Attorney,
Havre, Montana

Submitted on Briefs:  February 29, 1996

Decided:  April 23, 1996

Filed:

Clerk

Justice Charles E. Erdmann delivered the opinion of the Court.

David Girard Kelman appeals from the judgment and sentence entered by the Twelfth Judicial District Court, Hill County, on a jury verdict finding him guilty of the felony offense of tampering with public records or information. We affirm.

The issues on appeal are as follows:

1. Was there sufficient evidence to support the jury verdict?

2. Did the District Court err when it denied Kelman's motion for a new trial based on alleged juror misconduct?

## FACTS

Kelman is a principal owner of Big Ten Electronics (BTE), a corporation that manufactures and distributes video gambling equipment. He is also the managing partner of American Music, a business which places gambling machines, jukeboxes, and pinball machines in various establishments throughout Montana. In the fall of 1991, after discovering an opportunity to purchase and remodel a gambling casino located in Havre, Kelman purchased the property and obtained a liquor license for the establishment which was named Boxcars Casino.

Al Ransome, a Louisiana resident, and his partner, Joe Terrell, formed a Louisiana corporation called Gaming Management, Inc. (GMI) in 1991 to become involved in the video gambling business in Louisiana. They intended to file an application for a Louisiana video gambling license and hoped to become a distributor

2

in Louisiana for video poker machines. Ransome hired two individuals, Dick Odom and John Marley, to assist him in the business venture, and in 1991 Odom and Marley contacted Kelman to discuss opportunities for distributing BTE video gambling machines in Louisiana.

Sometime between September and November 1991, Marley and Odom informed Ransome of the opportunity to become involved in the Boxcars business venture. The proposal was that Ransome's corporation would put up half the cost of purchasing and remodeling the building and securing the liquor license and in return Kelman and GMI would become 50/50 partners in Boxcars. The conditions to finalizing the partnership were payment of GMI's share of the capital contribution, the signing of a partnership agreement, and approval by the State of Montana of GMI's involvement in the project.

In November 1991 Kelman's attorney, Matt Robinson, presented Ransome with a written partnership agreement. Ransome made two amendments to the agreement, reran it on his computer, and signed it. Ransome testified that when he inquired of Robinson when Kelman would sign the agreement he was told that in order to avoid delay in obtaining the gambling license, the agreement would be signed after the business was open and GMI's share of the money had been paid. Nevertheless, Ransome testified that "the agreement was there between us, and I trusted the agreement."

3

Kelman would periodically send Ransome a list of expenditures related to Boxcars and Ransome would send money covering half of the expenses. On December 24, 1991, Ransome sent Kelman a check for $25,000 with a notation stating "reimbursement for Boxcar's [sic], Havre, Montana Gaming Mgt." Ransome wire transferred $25,000 to Kelman on January 21, 1992, $20,000 on March 20, 1992, and $20,000 on April 15, 1992, for a total of $90,000. Ransome made no further advances after April 15, 1992. The funds were deposited into a bank account in Kelman's name at the First Bank in Great Falls. The account was used primarily for the Boxcars venture and Kelman testified that "every penny" sent by Ransome had been spent at Boxcars.

On January 31, 1992, the Gambling Control Division of the Montana Department of Justice (the Division) received an application from Kelman for a gambling operator's license. The application was prepared and signed by Robinson as Kelman's attorney. John Flynn, a revenue agent with the Division, reviewed the application and determined that the information provided was incomplete. Flynn was specifically concerned about where the money to finance the business was coming from and whether Kelman was receiving funds from noninstitutional sources.

On March 18, 1992, Flynn and his supervisor met with Kelman and Robinson to discuss the application and the Division's concern over noninstitutional lenders. On March 23, 1992, the Division received an NIL (noninstitutional loan) report form in which Kelman

4

reported two noninstitutional loans--one from American Music for $60,000 and one from BTE for $75,900. By March 20, 1992, Kelman had received $70,000 from Ransome for the Boxcars project.

At the time the NIL reporting form was submitted, Kelman resubmitted his application for a gambling operator's license since the original four-page application had been revised into a longer six-page form. The new application was signed by Robinson on Kelman's behalf. Section E of the application indicated that no other person or entity had any financial interest or derived income from the business. Section N of the application required Kelman to provide creditor information for each outstanding loan and/or financial obligation (institutional/personal/other) obtained or used for operating the business. Kelman reported two loans from the First Bank in Great Falls, one for $60,000 and one for $80,000. No information was provided concerning the $70,000 financial obligation to Ransome.

Flynn sent the application to Rick Losleben, an investigator with the Gambling Investigations Bureau of the Montana Department of Justice, to verify the information. On April 27, 1992, Losleben and Kelman met to discuss the application. By this time, Kelman had received $90,000 from Ransome. Losleben asked Kelman for additional information about the loans to Boxcars from American Music and BTE. After Losleben and Kelman reviewed the application and Kelman made some changes to the document, Kelman signed the application.

5

During the course of the meeting, Losleben filled out a standard investigation report which Kelman also signed. In Section C of that report, Kelman was asked who had invested in Boxcars. Kelman listed loans from First Bank of Great Falls, American Music, and himself. In Section D Kelman indicated no one had any right to share in the profits or had an obligation for business liabilities relating to the gambling or liquor operations of the business. Section K required Kelman to list the amount and sources of all financing for the business and list all loan agreements. Kelman listed loans received from BTE, American Music, and First Bank of Great Falls. He did not list the $90,000 which by then he had received from Ransome and spent on the Boxcars project. After the meeting Losleben forwarded the information to the Division and a gambling license was issued to Kelman. Boxcars Casino opened for business on June 24, 1992.

During a trip to Montana in August 1992, Ransome discovered that Montana law would prevent a nonresident from becoming a 50/50 partner in the Boxcars operation. Ransome testified that at that point in time he considered the money he had sent to Kelman to be a loan which he expected Kelman to repay once the business was up and running.

In May 1992 Ransome had applied for a video gambling operator's license in Louisiana and informed Louisiana authorities he had an interest in the Boxcars operation. In September 1992 Losleben received material from a Louisiana state trooper regarding

6

Ransome's application for the Louisiana license and his stated involvement with Boxcars. In the summer of 1993, Losleben met with Ransome in Baton Rouge to discuss the situation and, as a result, Losleben identified the bank account into which the funds from Ransome to Kelman had been deposited. This was the first information Montana authorities received concerning the funds provided by Ransome for the Boxcars project.

On May 25, 1994, Kelman was charged with two counts of tampering with public records or information pursuant to § 45-7-208, MCA, based upon his failure to disclose the funds received from Ransome on his application to the Division. Kelman entered pleas of not guilty to both counts. On November 18, 1994, the District Court granted Kelman's motion to merge the two counts into one count. On November 28 through 30, 1994, Kelman was tried before a jury which returned a guilty verdict. On December 22, 1994, Kelman filed a motion for a new trial based on alleged juror misconduct. On January 4, 1995, the District Court denied the motion and sentenced Kelman to one year and one day in the Montana State Prison together with a fine of $35,000 plus a ten percent surcharge. The District Court suspended the entire prison sentence. This appeal followed.

## ISSUE 1

Was there sufficient evidence to support the jury verdict?

When the issue on appeal in a criminal case is whether there was sufficient evidence to support a jury verdict, the standard of

7

review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Licht (1994), 266 Mont. 123, 131, 879 P.2d 670, 675 (citing State v. Lyons (1992), 254 Mont. 360, 363, 838 P.2d 397, 399).

Section 45-7-208, MCA, defines the offense of tampering with public records or information as follows:

> (1) A person commits the offense of tampering with public records or information if he:
> (a) knowingly makes a false entry in or false alteration of any record, document, legislative bill or enactment, or thing belonging to or received, issued, or kept by the government for information or record or required by law to be kept by others for information of the government;
> (b) makes, presents, or uses any record, document, or thing knowing it to be false and with purpose that it be taken as a genuine part of information or records referred to in subsection (1)(a); or
> (c) purposely destroys, conceals, removes, or otherwise impairs the verity or availability of any such record, document, or thing.
> (2) A person convicted of the offense of tampering with public records or information shall be imprisoned in the state prison for any term not to exceed 10 years or be fined an amount not to exceed $50,000, or both.

Kelman argues that he acted in good faith and on the advice of his counsel. He maintains that Robinson completed the application form and Losleben completed the investigation report. Thus, Kelman claims he did not knowingly falsify the information contained in the application documents. He claims he made an honest effort to comply with the requirements of the application which he contends were confusing and ambiguous.

8

Kelman goes on to argue that the funds sent by Ransome were personal in nature and that Flynn and Losleben indicated they were not interested in knowing the source of the funds he was personally investing in the business. Kelman further claims that at the time the application forms were submitted neither his partnership with Ransome nor a loan agreement had been consummated. Thus, he claims he was put into a "Catch-22" situation in that the funds could not properly be characterized as either an investment in the business or a loan obligation.

The State argues that there was sufficient evidence presented at trial of every element of the crime, including the requisite mental state necessary to convict Kelman. The State contends that the $90,000 Kelman received from Ransome was either an investment in Boxcars or a financial obligation of the business, which in either case should have been reported on the application and investigation report. The State maintains that Kelman's contention that the loan was "personal" rather than a loan of money for the Boxcars business venture is not credible and raises the inference that he was not telling the truth about how the $90,000 was omitted from the application materials.

The jury was instructed that the existence of a mental state may be inferred from the acts of the accused and the facts and circumstances connected with the offense. Section 45-2-103(3), MCA. The jury was presented with evidence concerning Kelman's acts and the circumstances surrounding the case.

9

Although Robinson initially signed the gambling operator application form, he testified that at that point in time he was not aware that Kelman had received money from Ransome for the Boxcars project. When Flynn and his supervisor met with Kelman and Robinson in March 1992, Flynn explained the definition of a noninstitutional source of funding. Flynn sent Kelman a follow-up letter after the meeting emphasizing the importance of disclosing noninstitutional funding. When Kelman completed the NIL form later that month he indicated he had received two noninstitutional loans, one from American Music and one from BTE. He failed to disclose the $70,000 he had already received from Ransome.

By the time Kelman met with Losleben, Kelman had received $90,000 from Ransome. Losleben and Kelman together reviewed the pending application and the investigation report. Losleben filled out the report but Kelman acknowledged he was present at the time and read through the document before he signed it. Both forms clearly indicated above the signature lines that the information was true and correct and that false information could result in denial of the license and criminal prosecution. Nowhere on either the application form or the investigation report did Kelman disclose the funds received from Ransome. At no point during his conversations with Flynn or Losleben did Kelman mention the Louisiana funding for the project.

Kelman claims he did not list the Ransome money because he and Ransome had not yet executed a formal partnership or loan

10

agreement. However, the record indicates that Ransome sent the money to Kelman specifically for the Boxcars project and that the money went directly into an account used to pay for Boxcars' expenses. Kelman nevertheless made a conscious choice not to disclose to the Division the funds sent by Ransome when disclosure of such noninstitutional funding sources was required.

The jury did not find credible Kelman's contention that Ransome's money was neither an investment in Boxcars nor a loan for the business venture. We have stated that the credibility of witnesses and the weight to be assigned to their testimony are to be determined by the trier of fact and disputed questions of fact and credibility will not be disturbed on appeal. State v. Graves (1995), 272 Mont. 451, 457, 901 P.2d 549, 553. The jury decides the facts and who to believe. Graves, 901 P.2d at 553.

We conclude, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. We hold that sufficient evidence existed to support the jury verdict, and therefore, affirm the District Court on this issue.

ISSUE 2

Did the District Court err when it denied Kelman's motion for a new trial based on alleged juror misconduct?

We review a district court's denial of a motion for a new trial to determine whether the district court abused its

11

discretion. State v. Mummey (1994), 264 Mont. 272, 276, 871 P.2d 868, 870. Absent an abuse of discretion the district court's decision concerning whether or not to grant a motion for a new trial will be affirmed. State v. Hatfield (1995), 269 Mont. 307, 310, 888 P.2d 899, 901.

Kelman moved for a new trial on the ground that the jury was exposed to extraneous prejudicial information. Kelman attached to his motion an affidavit from one of the jurors stating that during deliberations another juror stated that "she believed that David Kelman owned the Playground Bar in Great Falls, Montana." Kelman alleges that the Playground Bar is a strip bar with a bad reputation. The affiant stated that it appeared the comment was made to make Kelman look bad. The District Court considered the juror affidavit but denied the motion for new trial reasoning that the juror statement was not material to Kelman's guilt or innocence and that insufficient evidence existed to show that the conviction was related to the alleged remark.

Rule 606(b), M.R.Evid., provides that a juror may not testify as to what occurred during the jury's deliberations except when the information pertains to: (1) whether extraneous prejudicial information was improperly brought to the jury's attention; (2) whether any outside influence was brought to bear on any juror; or (3) whether any juror was induced to assent to any verdict or finding by resort to the determination of chance. Kelman argues

12

that the juror statement was extraneous prejudicial information properly received under Rule 606(b)(1), M.R.Evid.

Kelman contends that the initial jury panel vote was 6-6 but that sometime after the comment was made the panel vote was 9-3 in favor of a guilty verdict. He maintains that the statement was inherently prejudicial given the "generally sleazy image" of strip clubs and concludes that "many jurors would assume that a strip club owner is likely to be a person who would intentionally mislead governmental regulatory authorities." He argues that "the jury herein was comprised almost exclusively of women, likely to have an unfavorable opinion of strip clubs no matter how honest or lawful their operation." Kelman argues that the jury statement amounted to juror misconduct sufficient to require a new trial.

The State counters that the alleged statement was an internal influence and therefore does not fall within one of the three exceptions set forth in Rule 606(b), M.R.Evid. The State further argues that even if the statement was extraneous information, the information was not prejudicial to Kelman and the District Court did not abuse its discretion in denying the motion for new trial.

In State v. Brogan (1995), 272 Mont. 156, 900 P.2d 284, we held that juror affidavits may not be used to impeach a verdict based upon internal influences on the jury such as a mistake of evidence or misapprehension of the law. Brogan, 900 P.2d at 287 (citing Harry v. Elderkin (1981), 196 Mont. 1, 8, 637 P.2d 809, 813). Where external influence is exerted or external prejudicial

13

information is brought to the jury's attention, juror affidavits can be the basis of overturning the judgment. Brogan, 900 P.2d at 287. Examples of external influence include a juror's telephone call obtaining information with regard to previous litigation by the plaintiff, visiting the scene of an accident, or bringing a newspaper article about the trial into the jury room for the jurors to see. Brogan, 900 P.2d at 287 (citing Geiger v. Sherrodd (1993), 262 Mont. 505, 510-11, 866 P.2d 1106, 1109).

We must therefore determine whether the statement was an external or internal influence on the jury. In State v. Hage (1993), 258 Mont. 498, 853 P.2d 1251, among other claims of juror misconduct was the allegation that one juror had informed other jurors that he had personal knowledge that a telephone log was kept of all telephone calls made from the jail. Hage, 853 P.2d at 1256. Citing State v. DeMers (1988), 234 Mont. 273, 762 P.2d 860, we concluded that knowledge and information shared from one juror to another or others is not an extraneous influence. Hage, 853 P.2d at 1257.

Moreover, one of the purposes behind Rule 606(b), M.R.Evid., is to ensure that jurors are able to deliberate free from the frivolous and recurrent invasions of their privacy by disappointed litigants. State v. Maxwell (1982), 198 Mont. 498, 505, 647 P.2d 348, 353. Jurors are expected to bring to the courtroom their own knowledge and experience to aid in their resolution of the case. DeMers, 762 P.2d at 863.

14

The statement at issue in the present case is a juror's belief that Kelman owned the Playground Bar. Like the juror's belief as to the jailhouse telephone log at issue in <u>Hage</u>, we conclude that the statement made in the present case, whether mistaken or not, was an internal influence and within the prohibition of Rule 606(b), M.R.Evid. Even though we hold that the District Court erred in considering the juror affidavit in ruling on Kelman's motion for a new trial, we conclude the court did not abuse its discretion when it denied the motion. In affirming the District Court on this issue, we rely on our determination that the juror statement was not an external influence subject to the exceptions of Rule 606(b), M.R.Evid.

Affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____
Justices

15

Justice W. William Leaphart, specially concurring.

Although I concur in the result reached by the Court, I do not agree with the Court's conclusion that the juror's statement as to her belief that Kelman owned the Playground Bar in Great Falls was an internal influence on the jury and, thus, outside the scope of Rule 606(b), M.R.Evid. Relying on State v. Brogan (1995), 272 Mont. 156, 161, 900 P.2d 284, 287, the Court takes the approach that Rule 606(b), M.R.Evid., only encompasses situations in which information is brought to the jury's attention through external sources; e.g., telephone calls, visits to the scene of an accident or a newspaper being brought into the jury room. The Court makes the mistake of focusing on the non-jury source of the information to the exclusion of the substance of the information. Under the Court's rationale, if a juror brought a newspaper into the jury room which had an article about Kelman's owning the Playground Bar, that would be considered an external source and, thus, could be the subject of an affidavit under Rule 606(b), M.R.Evid. However, since that same information was brought before the jury through an oral representation by a juror, we are left powerless to take any remedial action. I disagree.

Rule 606(b), M.R.Evid., provides that a juror may testify as to what occurred during deliberations when extraneous prejudicial information is improperly brought to the jury's attention. The focus of the rule is upon the "extraneous prejudicial" *nature* of the information. Application of Rule 606(b), M.R.Evid., does not

16

hinge upon whether or not the information was introduced by a source from outside the jury room. Thus, in the present instance, the question is not how the information about the Playground Bar got to the jury but, rather, whether that information was extraneous (outside the record) and prejudicial.

In my view, when facts about a party, other than those deemed relevant and admissible at trial, are brought to the jury's attention, those facts are extraneous. It is one thing for jurors to apply their common sense or knowledge to the facts of the case, as developed at trial. That is the very sort of internal deliberation envisioned by our system of justice. It is entirely another matter if a juror, rather than merely applying his/her common sense and knowledge to the facts of the case, injects new facts about the defendant into the deliberations. In a criminal case such as this, juror reliance on anything other than facts of record violates the right of confrontation and cross-examination.

In United States v. Perkins (11th Cir. 1984), 748 F.2d 1519, the defendant was convicted of conspiracy and obstruction of justice. On appeal, Perkins alleged juror misconduct based upon the testimony of one juror to the effect that another juror was "especially committed" to a guilty verdict and that he stated he knew Perkins and had previously served on a committee with him. The Eleventh Circuit ordered a new trial finding that the juror's conduct violated Perkins' right under the Sixth Amendment to a jury verdict based on the evidence at trial.

> Extrinsic evidence, evidence that has not been subject to
> the procedural safeguards of a fair trial, threatens such

17

constitutional safeguards as the defendant's right of confrontation, of cross-examination, and of counsel. [Citation omitted.] In addition, since such evidence has not been subject to the rules of evidence, it may confuse the jurors . . . .

Perkins, 748 F.2d at 1533.

The Eleventh Circuit then held that the injection of extrinsic evidence through a juror created a rebuttable presumption of prejudice that the government could overcome by demonstrating that the consideration of this evidence was harmless.

[The juror's] remarks that he knew Perkins and/or had served on a committee with him were heard by eight of [the juror's] eleven co-jurors. These comments were made before a jury which for many hours had remained hopelessly deadlocked, and were made by a juror who was outspoken in his belief that Perkins should be convicted. The likelihood of prejudice on a jury is obvious.

Perkins, 748 F.2d at 1534. In Perkins, the government was unable to overcome the presumption of prejudice.

United States ex rel. Owen v. McMann (2nd Cir. 1970), 435 F.2d 813, *cert. denied*, 402 U.S. 906 (1971), was a habeas corpus proceeding in which the defendant alleged that three jurors had considered extraneous statements about him, that is, statements which were not in the record. The district court, after conducting a hearing, found:

In substance, the jurors or some of them were told by other jurors during the trial and the deliberations: that the defendant had been in trouble all his life; that he had been suspended from the police force in connection with the unauthorized use of a prowl car; that he had been involved in a fight in a tavern; that one of the juror's husband was an investigator and that he knew all about plaintiff's background and character, which was bad; and that petitioner's father was always getting him out of trouble.

McMann, 435 F.2d at 815.

18

The Second Circuit, in affirming, concluded that McMann had been denied his Sixth Amendment right of confrontation.

> The invocation of the confrontation clause in *Parker* was entirely appropriate to shield the defendant from comments to the jury by one whose statements, if admissible at all, could have properly been received only from the witness stand, subject to the procedural safeguards which the Sixth Amendment requires. But, so far as we know, the Court has never suggested that jurors, whose duty it is to consider and discuss the factual material properly before them, become "unsworn witnesses" within the scope of the confrontation clause simply because they have considered any factual matters going beyond those of record. To resort to the metaphor that the moment a juror passes a fraction of an inch beyond the record evidence, he becomes "an unsworn witness" is to ignore centuries of history and assume an answer rather than to provide the basis for one.

> Although accurate knowledge of what goes on in the jury room is unhappily limited, see Kalven and Zeisel, The American Jury vi-vii (1966), we suspect there are many cases where jurors make statements concerning the general credibility or incredibility of the police, the need of backing them up even when there is reasonable doubt of guilt or putting brakes upon them even when there is none, the desirability of overcoming reasonable doubt because of the repugnance of particular crimes or of yielding to less than reasonable doubt because of their insignificance, and concerning other matters that would invalidate a judgment if uttered by a judge, see *Id*. at 131-32. Yet this is the very stuff of the jury system, and we have recognized, in a not unrelated context, that the standards for judges and juries are not the same, United States v. Maybury, 274 F.2d 899, 902-903 (2 Cir. 1960). The touchstone of decision in a case such as we have here is thus not the mere fact of infiltration of some molecules of extra-record matter, with the supposed consequences that the infiltrator becomes a "witness" and the confrontation clause automatically applies, but the nature of what has been infiltrated and the probability of prejudice.

McMann, 435 F.2d at 817-18. The Court, relying on the Fifth Circuit holding in United States v. McKinney (5th Cir. 1970), 429 F.2d 1019, *cert. denied*, 401 U.S. 922, concluded:

In short, the inquiry is not whether the jurors "became

19

witnesses" in the sense that they discussed *any* matters not of record but whether they discussed specific extra-record *facts* relating to the defendant, and if they did, whether there was a significant possibility that the defendant was prejudiced thereby.

McMann, 435 F.2d at 818 n.5.

By way of further illustration, the Fifth Amendment to the United States Constitution and Article II, Sec. 25 of the Montana Constitution both protect an accused from having to testify against himself. If, despite this constitutional protection, a juror advises her fellow jurors that she heard that the defendant admitted to having committed the offense in question, that comment would be extraneous, prejudicial and a violation of the defendant's constitutional right to remain silent.

Despite the above examples of situations in which extraneous (outside the record) and highly prejudicial material is introduced into the jury room by jurors themselves, this Court would apparently hold that these are strictly "internal" influences and, thus, beyond the reach of Rule 606(b), M.R.Evid. I cannot agree with the majority's proposition that Rule 606(b), M.R.Evid., only encompasses prejudicial materials introduced into the jury room through non-juror sources; that it does not pertain to a juror's reliance on personal knowledge of additional "facts" about the defendant which have not been subject to the procedural safeguards of a fair trial. To the extent that State v. Hage (1993), 258 Mont. 498, 853 P.2d 1251 or State v. Brogan (1995), 272 Mont. 156, 900 P.2d 284, express a contrary view, I would vote to overrule or limit their holdings.

20

In the present case, although I believe that the statement about Kelman's ownership of a strip bar in Great Falls was extraneous and thus an "external" influence, the statement does not satisfy the other prong of the Rule 606(b)(1), M.R.Evid., test. That is, it was not prejudicial. See Lacy v. Gabriel (D. Mass. 1983), 567 F. Supp. 467, 470-71, *aff'd*, 732 F.2d 7 (1st Cir. 1984), *cert. denied*, 469 U.S. 861 (in habeas corpus proceeding arising out of murder conviction, where one juror had uncovered masked portions of photographs, the appellate court found that it was a violation of the defendant's right of confrontation. The error, however, was harmless where other evidence of the defendant's guilt was copious). The issue at hand was not whether Kelman was engaged in unsavory business ventures but whether he had tampered with public records. The alleged ownership of the Playground Bar was not relevant to any of the elements of the crime charged and, therefore, the juror's statement had no bearing on a material fact in the case. Accordingly, despite the Court's misreading of Rule 606(b), M.R.Evid., I concur with the result.

_W. William Leaphart_
Justice

21

April 23, 1996

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:

Stephen J. Nardi
Sherlock & Nardi
30 Fifth Street East
Kalispell MT 59901-4999

Hon. Joseph P. Mazurek, Attorney General
Kathy Seeley, Assistant Attorney General
215 N. Sanders
Helena MT 59620

David G. Rice
Hill County Attorney
Box 912
Havre MT 59501-0912

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
Deputy