UNITED STATES of America,

v.

Martha STEWART and Peter Bacanovic, Defendants.

No. 03 CR.717(MGC).

United States District Court, S.D. New York.

May 5, 2004.

See also 317 F.Supp.2d 432, 2004 WL 954483.

Michael S. Schachter, Asst. U.S. Atty., Mary Jo White, U.S. Atty., Criminal Division, New York City, for U.S.

Rebecca A. Monck, Robert G. Morvillo, John J. Tigue, Jr., Morvillo, Abramowitz, Grand, Iason & Silberberg, PC., New York City, for Martha Stewart.

Richard M. Strassberg, Goodwin Procter, LLA, New YOrk City, avid J. Apfel, Goodwin, Procter, LLP, Boston, MA, for Peter Bacanovic.

David A. Schulz, Alia L. SMith, Levine, Sullivan, Koch & Schulz, LLP, New YOrk City, for Media Coalition.

## OPINION

CEDARBAUM, District Judge.

Defendant Peter Bacanovic moves for a new trial pursuant to Fed.R.Cr.P. 33 or, alternatively, an evidentiary hearing on allegations that the jury that convicted him considered extraneous prejudicial information during its deliberations. His co-defendant, Martha Stewart, joins the motion. For the following reasons, the motion is denied.

## Background

After a five-week trial, Bacanovic was convicted of obstruction of an agency proceeding, making false statements to government officials, perjury, and conspiring to do those things. The jury acquitted him of a charge of making and using a false document. Stewart was convicted of obstruction of an agency proceeding, two counts of making false statements, and conspiring to do those things.[1]

The criminal charges against Stewart and Bacanovic arose from Stewart's December 27, 2001 sale of 3,928 shares of stock in ImClone Systems, Inc. ("ImClone"). ImClone is a biotechnology company whose then-chief executive officer, Samuel Waksal, was a friend of Stewart's and a client of Stewart's stockbroker at Merrill Lynch, defendant Bacanovic. On December 28, 2001, the day after Stewart sold her shares, ImClone announced that the Food and Drug Administration had rejected the company's application for approval of its lead product, Erbitux.

The Government presented evidence at trial that on December 27, 2001, Bacanovic learned that Waksal and several of his family members were selling or attempting to sell their ImClone shares. Bacanovic instructed his assistant, Douglas Faneuil, to inform Stewart of the Waksals' trading activity, and she sold her shares in response to that information. The Government also presented evidence that defendants lied about the real reason for Stewart's sale in order to cover up what was possibly an illegal trade and to deflect attention from Stewart in the ensuing investigations into ImClone trading in advance of the Erbitux announcement.

---

1. Defendant Stewart's motion for a judgment of acquittal of a charge of securities fraud was granted before the case was submitted to the jury. *See United States v. Stewart,* 305 F.Supp.2d 368 (S.D.N.Y.2004).

Defendants move for a new trial on two grounds: (1) that jurors discussed information about Stewart that had not been received in evidence; and (2) that jurors improperly considered evidence that had been admitted only as against Stewart when deliberating on the crimes charged against Bacanovic.[2]

### Discussion

■ Courts must be on guard to ensure that criminal defendants' Sixth Amendment rights are not violated by the jury's consideration of incriminating information that is not evidence received at trial. "[T]rial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Loliscio v. Goord*, 263 F.3d 178, 185 (2d Cir.2001) (quoting *Turner v. Louisiana*, 379 U.S. 466, 472–73, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965)). Accordingly, courts presume that any extra-record information of which jurors become aware is prejudicial. *See United States v. Hillard*, 701 F.2d 1052, 1064 (2d Cir.1983) (citing *Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954)). However, that presumption can be overcome by a showing that the information was harmless. *See id.* The test is an objective one: the trial court must determine "the likelihood that the influence would affect a typical juror." *United States v. Greer*, 285 F.3d 158, 173 (2d Cir.2002) (quoting *Bibbins v. Dalsheim*, 21 F.3d 13, 17 (2d Cir.1994) (per curiam) quoting *Miller v. United States*, 403 F.2d 77, 83 n. 11 (2d Cir.1968)). The touchstone of such cases is "not the mere fact of infiltration of some molecules of extra-record matter ... but the nature of what

has been infiltrated and the probability of prejudice." *United States ex rel. Owen v. McMann*, 435 F.2d 813, 818 (2d Cir.1970). In analyzing such information, "[t]he trial court should assess the 'possibility of prejudice' by reviewing the entire record, analyzing the substance of the extrinsic evidence, and comparing it to that information of which the jurors were properly aware." *United States v. Weiss*, 752 F.2d 777, 783 (2d Cir.1985) (citing *Sher v. Stoughton*, 666 F.2d 791, 794 (2d Cir. 1981)).

■ However, "courts are, and should be, hesitant to haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences." *United States v. Moon*, 718 F.2d 1210, 1234 (2d Cir.1983). As the Supreme Court explained, "full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct." *Tanner v. United States*, 483 U.S. 107, 120–21, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987). A post-trial inquiry is not mandatory whenever defendants claim that extra-record evidence tainted their trial; rather, "a trial court is required to hold a post-trial jury hearing only when reasonable grounds for investigation exist. Reasonable grounds are present when there is clear, strong, substantial and incontrovertible evidence, that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant." *Id.* (citation omitted).

### I. Juror Consideration of Information Not Received in Evidence

■ Bacanovic's attorney, Richard Strassberg, states in an affidavit that he

---

**2.** Because this issue has no bearing on the fairness of Stewart's trial, Stewart has no cognizable interest in this portion of Bacanovic's motion.

received an unsolicited telephone call from a juror in this case after the verdict had been returned. This unidentified juror informed Strassberg that members of the jury had discussed information about Stewart that was not part of the evidence received in this case, but which had been reported in the press. Specifically, the jurors had discussed the price of a handbag that Stewart carried into court during *voir dire* and the hourly rate charged by her lawyer. Defendants argue that this is extraneous information which improperly prejudiced them. Although the information refers only to Stewart, defendants argue that because of Bacanovic's close association with Stewart, any prejudice to her necessarily affected the fairness of his trial. Defendants contend that the fact that the jurors were discussing these matters reflects the same bias as comments made by one of the jurors, Chappell Hartridge, after the verdict had been returned. Defendants also argue that the anonymous telephone disclosure, in combination with the extensive press coverage of the trial, supports an inference that the jurors were exposed to other media reports and may have been prejudiced by them.

For two reasons, these speculations do not warrant either a new trial or an evidentiary hearing. First, the Strassberg affidavit offers no clear, nonspeculative evidence that a specific impropriety has occurred. The affidavit does not explain the context or extent of these discussions. It is not clear how this information entered the jury room, how many jurors discussed it, or when. In short, the affidavit does not demonstrate that this information was anything more than idle gossip among a few jurors during the hours they spent together.

Second, even if the affidavit were more complete, these allegations would not satisfy the test for determining whether the extra-record information would have prejudiced defendants in the eyes of the average juror. With respect to Bacanovic, defendants have offered only conclusory allegations regarding how this information about Stewart could have any effect on the jury's perception of him. Even if the jury were to associate Bacanovic in some way with reports about Stewart's handbag and the fees charged by her lawyer, all that this information reveals is that Stewart is a wealthy woman. Defendants cannot seriously contend that the jurors were not already aware of that. Not only did the majority of the jurors admit to some knowledge of Stewart during *voir dire,* but Stewart's lawyer made her wealth a cornerstone of her defense. In his opening statement, Stewart's counsel stated twice that the value of Stewart's ImClone shares was less than one percent of Stewart's net worth. He also contrasted Stewart's sale of 3,928 shares of ImClone stock with her sale of $45 million worth of stock in her own company, to suggest that Stewart was focused on more significant matters at the time the conspiracy was alleged to have taken place:

> So in December, and in January, we have two events of gain to Martha Stewart. One is the 3,900 shares of ImClone and one is the $45 million worth of shares of Martha Stewart Living Omnimedia. Which of those transactions would you have been most focused on if you had the opportunity to sell $45 million worth of value?

Trial Transcript at 836; *see also id.* at 4701–02. Extensive evidence of the latter transaction was received at trial. Defendants do not persuasively explain how a jury in possession of such evidence of Stewart's wealth would become unfairly prejudiced against them by learning how Stewart spent some of it.

Furthermore, this information is completely irrelevant to the charges against defendants, so it would not have led a typical jury to draw impermissible conclusions about guilt. This case is distinguishable from those situations in which jurors received extraneous information that had direct relevance to the crimes for which the defendant was being tried, and which therefore could be said to have been objectively prejudicial. *See, e.g., Bulger v. McClay,* 575 F.2d 407, 411–12 (2d Cir. 1978) (affirming the district court's grant of a writ of habeas corpus where members of the jury had read and discussed a newspaper article containing the defendant's address, which called into question his stated reason for being near the scene of the charged crime); *Owen,* 435 F.2d at 818–19 (holding that the verdict against the defendant lacked due process because some jurors had informed others that the defendant had a bad character and described specific instances of his misbehavior which were unrelated to the crimes charged and which had not been received in evidence). Facts pertaining to Stewart's pocketbook and legal fees simply would not lead the typical juror to believe that either defendant was more likely to conspire, to obstruct an agency proceeding by lying, or to commit the other crimes charged.

Defendants also contend that this information reflects and exacerbates the bias evident in Hartridge's post-verdict comments. Hartridge's comments are irrelevant to this inquiry and do not demonstrate bias. *See United States v. Stewart,* No. 03 Cr. 717, slip op. at 14–15 (S.D.N.Y. May 5, 2004). More importantly, defendants have not articulated the bias that is supposedly evident in these two pieces of extraneous information. Notably, the questionnaire administered during *voir dire,* which the parties jointly developed, probed whether any of the prospective jurors were biased against the wealthy or against wealthy criminal defendants, and defendants had the opportunity to challenge any juror who revealed such bias. They have not explained what it is about Stewart's handbag and legal fees that would have generated bias in a formerly impartial jury.

Nor do defendants' allegations support an inference that the jury was exposed to additional, and more prejudicial, extraneous information. The allegations in the Strassberg affidavit do not indicate that any juror was regularly reading about the case. In addition, it stretches credulity to consider that a juror who would contact Bacanovic's attorneys to report juror discussions of these trivial matters would not report the discussion of more serious extraneous information.

Defendants have failed to offer any evidence of specific improprieties occurring with respect to the jurors' discussion of this extraneous information. They have also failed to show that such information would have prejudiced a typical jury against them. Accordingly, their allegations do not justify a new trial or an evidentiary hearing.

## II. *Juror Consideration of Evidence Not Received Against Bacanovic*

■ Bacanovic also argues that while weighing the charges against him, the jury improperly considered evidence that had been received only against Stewart. One of the Government's witnesses, Mariana Pasternak, was a close friend of Stewart's and had been traveling with her on December 27, 2001. Pasternak testified that Stewart had told her that Waksal had sold his ImClone shares, and that Stewart had sold hers as well. Pasternak also testified that she recalled either thinking, or hearing Stewart say, words to the effect of "Isn't it nice to have brokers who tell you those things."

After Pasternak testified, Bacanovic moved for a mistrial on the ground that the jury would not be able to disregard Pasternak's testimony when deliberating on the charges against him. The motion was denied, but the jury was instructed that Mariana Pasternak's testimony was admitted into evidence only against Stewart, and that the jury could not consider any of Pasternak's testimony when deliberating on the crimes charged against Bacanovic.

Bacanovic now argues that the jury failed to follow that instruction. His evidence is an episode of the television program "Dateline NBC," on which six of the jurors appeared shortly after the verdict was returned. At one point during the program, the jurors discussed the effect of Pasternak's testimony, particularly her stockbroker reference. All of the jurors indicated that they found that statement incriminating. Chappell Hartridge elaborated, stating: "It took down two people with one shot because she mentioned Peter's name." One other juror appeared to agree with Hartridge's comment. Bacanovic argues that this statement shows that the jurors improperly convicted him by using evidence admitted only against Stewart.

For two reasons, Bacanovic's claim fails. First, Bacanovic does not persuasively explain why Hartridge's statement is admissible under Fed.R.Evid. 606(b). That rule provides that in a challenge to the validity of a verdict, jurors may not testify to most matters pertaining to the jury's deliberations or to the mental processes of any juror. Jurors may testify only "on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." *Id.* Bacanovic argues that Hartridge's statement is admissible to show that extraneous prejudicial information—namely, Pasternak's testimony—was brought to the jury's attention. Bacanovic points out that Pasternak's testimony would not have been admitted into evidence if he had been tried alone.

Extraneous prejudicial information is commonly understood to mean information the jury receives outside the courtroom. *See, e.g., Greer,* 285 F.3d at 166–67 (describing the district court's consideration of allegations that one juror had informed others that his brother had been involved in drug transactions with the defendant and that the jury had been contacted by a friend of the defendant prior to the trial); *Bulger,* 575 F.2d at 409 (weighing the prejudicial effect of information about the defendant that had appeared in a newspaper article published before the jury began deliberations). Bacanovic relies on *United States v. Schwarz,* 283 F.3d 76 (2d Cir. 2002), in arguing that evidence received against one defendant but not another is "extraneous" information with respect to the second defendant under Rule 606(b). In *Schwarz,* several police officers were accused of assaulting an arrestee and of conspiracy and obstruction of justice relating to the subsequent federal investigation of the assault. Schwarz's principal defense at trial was that no officer other than Justin Volpe, the defendant alleged to have been the primary perpetrator, was present during the assault. *See id.* at 88. During the trial, Volpe pleaded guilty outside the presence of the jury. The court informed the jury that Volpe had pleaded guilty and instructed the jurors to place no weight on that plea when considering the guilt of the remaining defendants. *See id.* After the jury convicted the remaining defendants of several of the charges against them, Schwarz moved for a new trial, submitting the affidavits of several jurors who stated that prior to reaching a verdict, another juror had informed them that during his plea allocution, Volpe had stated that an-

other police officer had been present at the assault. *See id.* at 88–89. This statement contradicted Schwarz's defense. The Second Circuit determined that the lower court had erred in failing to hold an evidentiary hearing on the jury's exposure to information which had not been offered or received in evidence against any defendant. *See id.* at 98–99.

Bacanovic misreads *Schwarz.* The potentially prejudicial information was not that Volpe had pleaded guilty, but that he made a statement during his plea allocution that contradicted Schwarz's defense. It was *that* information, which was not received at trial, but which entered the jury room through a juror who had learned about it from an external source. Unlike information that jurors may glean from press accounts of a trial, *see, e.g., Bulger,* 575 F.2d at 411, or from redacted portions of admitted evidence that the jury improperly or inadvertently views, *see, e.g., Benjamin v. Fischer,* 248 F.Supp.2d 251, 260 (S.D.N.Y.2002), evidence admitted against one defendant is part of the trial record. Essentially, Bacanovic's claim is not that the jury considered extraneous information, but that the jury failed to follow the court's limiting instructions. A jury's ability to follow legal instructions falls squarely within the realm of internal jury deliberations, which Rule 606(b) staunchly protects. *See United States v. Pabon–Cruz,* 255 F.Supp.2d 200, 217 (S.D.N.Y.2003); *cf. Tanner,* 483 U.S. at 124, 107 S.Ct. 2739 (quoting a congressional critique of a proposed version of Rule 606(b) that would "have [had] the effect of opening verdicts up to challenge on the basis of what happened during the jury's internal deliberations, for example, where a juror alleged that the jury refused to follow the trial judge's instructions"). Accordingly, Hartridge's statements are not admissible to attack the verdict.

 Second, even if Hartridge's post-trial statements were admissible, Bacanovic cannot show that Pasternak's testimony prejudiced him. The evidence that was admitted at trial as against Bacanovic was more than sufficient for the jury's verdict.

### Conclusion

Bacanovic has not submitted sufficient evidence to support a contention that the jury that convicted him considered extraneous prejudicial information in reaching their verdict. His allegations are too speculative and tenuous to justify an evidentiary hearing. Accordingly, defendants' motion is denied.

SO ORDERED.