**Donald BENJAMIN, Petitioner,**

v.

**Brian FISCHER, Superintendent, Sing Sing Correctional Facility, Respondent.**

**No. 02 Civ. 679(SAS).**

United States District Court, S.D. New York.

Dec. 23, 2002.

Joseph Di Simone, Mayer, Brown & Platt, New York City, for Petitioner.

Steven N. Schulman, Assistant Attorney General, New York City, for Respondent.

## *AMENDED OPINION AND ORDER*

SCHEINDLIN, District Judge.

## I. INTRODUCTION

Donald Benjamin ("petitioner"), an inmate at the Sing Sing Correctional Facility in Ossining, New York, brings this petition for a writ of habeas corpus pursuant to section 2254 of Title 28 of the United States Code (" § 2254"). On March 19, 1997, following a jury trial, Benjamin was convicted of one count of burglary in the second degree and one count of robbery in the third degree and was sentenced to eight years of imprisonment.

Benjamin's first claim is that his Sixth Amendment rights to be tried by an impartial jury and to confront witnesses were violated. Benjamin argues that the jury was prejudiced by extrinsic evidence during deliberations when it learned, through an inadequately redacted portion of a police report, that Benjamin had two prior robbery arrests and was on probation for one of those arrests.[1] *See* Memorandum

---

1. The poorly redacted portion of the report revealed that petitioner had two previous arrests for robbery and that he was on probation for one of those arrests. *See infra* Part II.E.

of Law in support of Petition for Writ of Habeas Corpus ("Pet.Mem.") at 22; Reply Memorandum of Law in Support of Petition for Writ of Habeas Corpus ("Rep. Mem.") at 3. In an earlier proceeding, petitioner's prior convictions for robbery and assault were held to be inadmissible except on cross-examination should petitioner testify. *See* Transcript of State Court Proceedings ("Tr.") at 34–35. Defense counsel's redaction of the police report was made without notification to or authorization by the trial court. *See* Opinion of Justice Carol Berkman, dated 3/18/97 ("Berkman Op.") at 3, Ex. G to Affidavit of Joseph De Simone, petitioner's attorney ("Simone Aff."), at A108. Benjamin secondly alleges that his trial counsel was ineffective because she failed to call three eyewitnesses who likely would have been unable to identify Benjamin as the robber, and because she failed to redact adequately the police report. *See* Pet. Mem. at 36; Rep. Mem. at 21.

Respondent opposes both claims, seeking to dismiss the petition. *See* Memorandum of Law in Opposition to Petition for Writ of Habeas Corpus ("Opp.Mem.") at 1–2, 43. For the reasons stated below, the petition is granted.

## II. BACKGROUND

### A. The Robbery

The following facts are not in dispute. On March 7, 1996, Harold Wenglinsky was robbed in his apartment building at 500 West 122nd Street in Manhattan by an African–American man. *See* Tr. at 236–37. When Wenglinsky returned from work at approximately 8:20 p.m., his wife buzzed open the lobby door, and an unknown man followed Wenglinsky in before the door closed. *See id.* at 236–37, 239. Wenglinsky waited for the elevator in the lobby with the unknown man standing beside him. *See id.* at 237, 239–40. The unknown man was wearing a black hooded "bubble" jacket with the hood up, but "his entire face was exposed." *See id.* at 254, 259–60, 264–65. When the elevator came, the two men got on the elevator. *See id.* at 237–40. A woman headed to the basement laundry room was also in the elevator. *See id.* at 237–38.

As soon as the woman got out of the elevator, the unknown man grabbed Wenglinsky by the neck, pushed him against the wall and demanded his wallet. *See id.* at 238, 244, 253, 259. When the elevator doors opened on the first floor, the assailant shoved Wenglinsky off the elevator and ran out into the lobby. There were three other people in the lobby at this time. *See id.* at 238, 247, 266. Wenglinsky removed his coat and threw it, along with his wallet, into the middle of the lobby. *See id.* 238, 248–49. The assailant picked up the coat, and ran out of the building. *See id.* at 248–49. Wenglinsky ran after the assailant, followed him down the block and chased him into another building, at which point Wenglinsky lost him. *See id.* at 249. The entire incident lasted approximately two minutes. *See id.* at 264–65.

Shortly after the incident, Wenglinsky reported the crime to Police Officer Dennis Ryan, who was assigned to the 26th Precinct's Detective Squad to investigate robberies. *See id.* at 255, 285. At trial, Ryan testified, after reviewing the police report he made shortly after the robbery, that Wenglinsky had told him that the attacker was a black man, *see id.* at 18–22, 6'1" tall and 170 pounds, *see id.* at 295. There was no indication in Officer Ryan's report about the assailant's puffy eyes or cheeks. *See id.* at 296. About two hours after the crime, Officer Ryan took Wenglinsky and Daniel Nexon, one of the witnesses at the crime scene, to the Manhattan Catch Unit to view photographs of persons fitting Wenglinsky's description

who had been previously arrested for similar crimes. *See id.* at 286, 293–94, 305–06. Wenglinsky viewed approximately 100 to 200 photographs in about ten to fifteen minutes, *see id.* at 7, 18, 20, 270, and picked out three or four individuals, including petitioner, who resembled his assailant, *see id.* at 9, 271, 303. After Officer Ryan said that he was "not interested in photos that looked like the guy," and that he "wanted the guy", *see id.* at 303, Wenglinsky settled on petitioner as the assailant, *see id.* at 18–20, 271. Unlike Wenglinsky, Nexon was unable to identify petitioner from the pictures shown at the photo viewing. *See id.* at 306.

Eleven days later, on March 18, 1996, Wenglinsky and two other eyewitnesses, Greg Alling and Richard Brun, viewed a six man lineup that included petitioner. *See id.* at 23–24. Wenglinsky picked Benjamin out of the lineup, *see id.* at 304; People's Ex. 1, while both Alling and Brun, who did not participate in the earlier photo view, failed to identify petitioner, *see* People's Exs. 2, 3. According to the police report, when a police officer asked Alling whether he recognized anyone in the lineup, Alling replied, "no, I can't be sure." *See* People's Ex. 2. When a police officer asked Brun the same question, he similarly stated, "no." *See* People's Ex. 3.

### B. Pretrial *Sandoval* Hearing

On January 16, 1997, the trial court conducted a *Sandoval* hearing.[2] *See id.* at 33–35. Benjamin had a prior felony conviction for attempted robbery in the second degree and a prior misdemeanor conviction for assault in the third degree. *See*

id. at 33–34. Judge Berkman ruled that Benjamin's prior convictions were inadmissible, but if Benjamin testified at trial, the prosecutor could ask whether Benjamin had been convicted previously of any crimes without inquiring into the underlying facts of those convictions. *See id.* at 34–35.

### C. Trial

#### 1. The People's Case

The prosecution called three witnesses at trial to put on its case-in-chief: (1) Wenglinsky; (2) Antonio Herrera, superintendent of the building where the crime occurred;[3] and.(3) Officer Ryan. Wenglinsky testified that the assailant was an African–American male in "his late teens, early twenties," who was "about six feet in height." *See id.* at 253–54. He also testified that the assailant had puffy cheeks, *see id.* at 253, although he did not mention that detail to the police at the time of the crime, *see id.* at 296, 387. Wenglinsky identified Benjamin in court as his assailant.

The suggestion made by defense counsel during cross-examination was that Wenglinsky had identified the wrong person at the lineup and incorrectly identified the person he saw in the photographs at the Manhattan Catch Unit. *See id.* at 270–73. Defense counsel emphasized that the encounter between Wenglinsky and his assailant lasted only two minutes during which the assailant wore a hood most of the time. *See id.* at 264–65, 273–74. By contrast, after Wenglinsky settled on Ben-

---

**2.** When the prosecution seeks to impeach a testifying defendant with prior bad acts including previous criminal convictions, the court must rule on the scope of the impeachment before the defendant takes the stand. *See People v. Sandoval*, 34 N.Y.2d 371, 357 N.Y.S.2d 849, 314 N.E.2d 413 (1974).

**3.** The building lobby had a video camera and the struggle in the lobby was captured on videotape. *See id.* at 281–82. The videotape does not contain a clear shot of the assailant's face. *See id.* at 414. However, it does show that the assailant had a different body type than the description given to the police by Wenglinsky. *See id.* at 387.

jamin's photo as that of his assailant, he was able to study the photo for an indefinite period of time, possibly solidifying an incorrect identification in his memory. *See id.* at 271.

In addition, cross-examination of Officer Ryan revealed that the description Wenglinsky gave the police immediately after the incident did not match that of petitioner, whose height and weight was recorded by Officer Ryan as 5′10″ and 20C pounds, respectively. *See id.* 302–03. Defense counsel emphasized that an error of three to four inches and thirty pounds was significant. In addition, when Wenglinsky arrived at the precinct after the robbery, he gave two different descriptions of his assailant, one to Officer Ryan and the other to a different officer.[4] *See id.* at 295–96. Each officer wrote down the description in a police report. The reports were taken within twenty minutes of each other. *See id.* Both police reports were taken before Wenglinsky reviewed the photographs at the Manhattan Catch Unit. *See id.* at 294.

On re-direct, Wenglinsky reiterated that petitioner was the assailant, and stated that his identification was based on the "face, the cheeks, the puffy eyes, and the shape of the head." *See id.* at 275. However, as Officer Ryan testified, there was no description of puffy cheeks or puffy eyes in either police report. *See id.* at 296, 387.

To emphasize the inconsistencies between the two police reports made shortly after the incident, defense counsel sought to introduce the reports into evidence. *See id.* at 295. The People ultimately did not object to the admission of Officer Ryan's report as defense Exhibit B. *See id.* at 301. The following discussion took place in open court:

> MR. GAY [the prosecutor]: Judge, the only objection I would have is that there are some things underlined on [the report]. I have a clean copy if that would be sufficient.
>
> MS. ONOFRIO [defense counsel]: That's fine. We can have it remarked.
>
> (Document marked as Defendant's Exhibit B in evidence).

*See id.* There was no mention of the portion of the report containing petitioner's prior arrest record, nor was there any mention of the report being redacted to remove any reference to any prior crimes. However, as stated in her affidavit, defense counsel blacked out with an ink marker the portion of the exhibit referring to petitioner's two prior robbery arrests.[5] *See* Affirmation of Adrienne R. Onofrio In Support Of Motion To Set Aside the Verdict, dated February 4, 1997 ("Onofrio Aff."), Ex. E to Simone Aff., at ¶ 4.

At trial, the court sustained the prosecutor's objection to a question defense counsel posed to Officer Ryan designed to elicit the fact that Brun and Alling had failed to pick petitioner out of the same lineup that Wenglinsky had viewed. *See id.* at 305–06. The trial court similarly sustained the prosecution's objection to questions regarding Nexon's failure to identify Benjamin from the photo files at the Manhattan Catch Unit. *See id.*

---

4. The description given to Officer Ryan was that of a black male, eighteen to twenty two, six foot one inch, 170 pounds, medium complexion, medium build, a black ski cap, maroon sweat pants, and a black bubble jacket with a hood. *See id.* at 295. The description given to the other officer was that of a black male, twenty years old, six foot two inches, eye color unknown, complexion unknown, black baseball hat, and a blue coat. *See id.*

5. As noted earlier, the actual exhibit referenced two prior robbery arrests and a probationary sentence for one of those arrests.

## 2. Defense Case

Petitioner did not testify but offered four alibi witnesses: (1) Constantine Plaissay, owner of Plaza Florist where petitioner worked; (2) Jamal Wright, petitioner's cousin; (3) Delores Wright, petitioner's mother; and (4) Nancy Conner, petitioner's girlfriend. Constantine Plaissay first testified that petitioner had been employed at Plaza Florist for the past six years and that his work was "excellent". *See id.* at 314. Plaissay testified that Benjamin worked until 4:27 p.m. on March 7, 1996. *See id.* at 312, 314. Jamal Wright, petitioner's cousin, testified that between 7:00 p.m. and 7:45 p.m. that evening, he was with Benjamin and their friend Jamal Balboa in the hallway of Balboa's apartment building. *See id.* at 322. Jamal Wright explained that they usually "hang out" at approximately that time of day. *See id.* at 323. The three talked in the hallway for approximately forty-five minutes because there was a big ice storm that night. *See id.* at 323.

Delores Wright, Benjamin's mother, testified that at 8:10 p.m. she called Benjamin at his girlfriend's apartment, and she spoke with him for about ten minutes. *See id.* at 334–35. Delores Wright remembered the day because there had been a big ice storm, and recalled the time because she had looked at her VCR clock when she arrived home from work. *See id.* at 336–38. Conner, petitioner's girlfriend, testified that she was in class until 8:45 p.m. on the day of the robbery, which she remembered because her teacher had let the class out early due to the ice storm. *See id.* at 354–55. Conner called petitioner at her apartment from a train stop on her way home. He answered the phone and they spoke. *See id.* at 348–49. Conner called again at approximately 9:30 p.m. and spoke with Benjamin for a short time. *See id.* She arrived home at 9:45 p.m. *See*

*id.* at 350. She also remembered that night because of the ice storm. *See id.* at 354.

## 3. People's Rebuttal Case

The prosecution re-called Officer Ryan, who testified that Benjamin had made a written statement at the time of his arrest. *See id.* at 372–73. In the written account, Benjamin stated that on the night of the robbery he worked until 5:00 p.m., then went to a friend's house where he stayed from 5:40 to 8:30 p.m. *See id.* at 372–75. Benjamin then went to his girlfriend's apartment where he waited for her to come home, which she did at 10:00 p.m. *See id.* 372–75. According to Officer Ryan, Benjamin also told him that he was with a friend named Cornell Wise on the evening of the robbery.[6] *See id.* at 373–74. This fact, however, did not appear in Benjamin's written statement. *See id.* at 373, 375.

## D. Jury Deliberations

During deliberations, the jury sent six notes to the judge. *See id.* at 468. One note requested: (1) all of the exhibits, (2) Wenglinsky's testimony regarding the description of the assailant he gave to the police, and (3) Wright's testimony. *See id.* at 459. There was no discussion of defendant's Exhibit B. *See id.* at 459–60. Later, the jury sent another note asking the court to explain, for the second time, the definition of reasonable doubt. *See id.* at 462. Judge Berkman read her previous charge on reasonable doubt to the jury. *See id.* In a later note, the jury advised the court that they were "unable to reach a unanimous verdict." *Id.* at 464. The trial court assembled the jury, delivered an instruction under *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), and then asked the jury to resume delibera-

---

**6.** At the time of the trial, Wise was in another state and therefore not able to testify.

tions. *See id.* at 466–68. Some time thereafter, the jury sent another note asking for a "lay explanation of reasonable doubt and a lay explanation of the concept of relying on one witness to convict." *See id.* at 468–69. The jury ultimately returned a guilty verdict on both the robbery and the burglary counts. *See id.* at 474–75.

### E. Post–Conviction Events

Three days after the verdict was rendered, defense counsel's office received a phone call from juror Julie Hynes. *See* Onofrio Aff. ¶ 6. Hynes stated that during the deliberations, the jurors had placed the police report up to the light, read through the black ink, and discovered petitioner's prior robbery arrests. *See id.* The poorly redacted portion of the police report contained the following specific information:

4. A Bads search conducted, posible [sic] suspect Benjamin, Donald, DOB–9–15–71 NYSID # 7424824L, 2 previous arrests, for Robbery.

5. A B.C.I. check was performed, revealed possible suspect is on probation for a Robbery arrest from 6–26–93. REG. # 1014030, Docket # 93X027650 Probation # 0793363

Unredacted Report of Officer Ryan dated March 7, 1996.

Hynes further stated that "as a result a number of jurors changed their verdict to guilty based on that information not in evidence." Hynes felt pressured into changing her verdict although she still had a reasonable doubt. *See* Onofrio Aff. ¶ 6. On the same day, Hynes called the trial court clerk and sent a sworn letter to Judge Berkman. In pertinent part, the letter stated:

During the deliberations one juror read aloud information from a police report that had been blacked out with [a] marker. He held it up to the light and shared with the jurors that Donald Benjamin had previously been arrested for robbery. This information seemed to influence some of the jurors, especially some who at that time were still undecided about the verdict.

At this point in deliberating it was difficult for me personally, being the only juror who felt the defendant was NOT guilty. For the next 3 hours I felt like I was on trial, having to go over and over again why I had doubts. I'm still not sure what was worse, the constant badgering from one juror in particular, who happened to be a lawyer, or the glares from most of the others.

I felt overwhelmed by the pressure of the other jurors and I felt light-headed from having very little to eat during the six and one half hours of deliberating. (My lunch order had showed up with a hair and a bug in it.) In the end I caved in under the pressure and didn't stick to what I truly believed. When I walked out of the court house, I knew I had done the wrong thing.

Letter of Julie A. Hynes, Ex. E to Simone Aff., at A100 ("Hynes Letter").

On February 4, 1997, based on Hynes' statement, defense counsel move to set aside the verdict, arguing that petitioner's prior conviction was improperly discovered by the jury and greatly prejudiced petitioner. *See* Motion to Set Aside the Verdict, dated February 4, 1997, Ex. D to Simone Aff., at ¶ 4.

The People filed an affirmation opposing the motion. *See* Affirmation of John Gay, Assistant District Attorney, in Response to Defendant's Motion to Set Aside the Verdict, Ex. F to Simone Aff. ("Gay Aff."). In his affirmation, the prosecutor did not challenge the veracity of Hynes' account of what happened during the jury's deliberations. He argued, however, that the police report in question was not extrinsic evidence because it was admitted as a defense

exhibit with no restrictions. *See id.* at ¶ 8. Furthermore, the prosecution maintained that even if a portion of the document was improperly considered, petitioner failed to show that there was a substantial likelihood that the document affected the verdict. *See id.* at A104.

Judge Berkman denied the motion and in her opinion reasoned:

> Th[e] "redaction" was performed without the knowledge or approval of the Court.... Had defense counsel requested a redaction the Court would have permitted it and would, in addition, have made certain that the redaction was effectively performed. Here, however, the method of redaction was wholly a defense decision and simply proved to be an inadequate safeguard. While the carelessness in preparing this exhibit may have been unfortunate, it does not alter the fact that the exhibit was introduced on [sic] the record without any restrictions and the jurors were entitled to fully inspect it during the course of their deliberations. Moreover, defense counsel had stipulated that all the exhibits received into evidence could be taken into the jury room without further conference.

Berkman Op. at 3–4.[7]

### F. Direct Appeal

Benjamin appealed to the Appellate Division, First Department on October 4, 1999. The Appellate Division affirmed the judgment of conviction on May 30, 2000. *See People v. Benjamin,* 272 A.D.2d 276, 709 N.Y.S.2d 517 (1st Dep't 2000). Petitioner then sought leave to appeal to the New York Court of Appeals. *See* Petitioner's Leave Application, dated August 15, 2000 and Reply Letter–Brief, dated September 21, 2000. The Court of Appeals denied leave to appeal on October 31, 2000. *See People v. Benjamin,* 95 N.Y.2d 904, 716 N.Y.S.2d 644, 739 N.E.2d 1149 (2000). Benjamin did not seek a writ of certiorari from the Supreme Court of the United States. Benjamin's petition for a writ of habeas corpus dated January 25, 2002, was received by this Court on January 28, 2002.

## III. DISCUSSION

### A. Procedural Requirements

A petitioner seeking habeas review of a state conviction must satisfy two procedural requirements. *First,* the petition must be timely made. The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides that a petitioner must file his habeas petition within one year of the date that his conviction became final. *See* 28 U.S.C. § 2244(d)(1). *Second,* a petitioner challenging a state judgment of conviction generally must have exhausted state remedies before he can seek federal relief. *See* 28 U.S.C. § 2254(b)(1)(A). Benjamin has met both requirements with regard to his Sixth Amendment claim.

For habeas purposes, a conviction becomes final when "a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari is finally denied." *Griffith v. Kentucky,* 479 U.S. 314, 321 n. 6, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987); *Williams v. Artuz,* 237 F.3d 147, 150–51 (2d Cir.2001). Benjamin filed his petition on January 28, 2002, less than one year after the time for filing a petition for certiorari had elapsed on January 29, 2001.

In addition, petitioner has fully exhausted his state remedies with regard to his

---

**7.** Judge Berkman's findings of fact are left undisturbed as petitioner has not rebutted the statutory presumption of correctness with any evidence, much less clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *see also Brown v. Artuz,* 283 F.3d 492, 498 (2d Cir. 2002).

Sixth Amendment claim.[8] The exhaustion requirement is satisfied when the defendant "fairly presents" a claim to the state court so that the court has "a fair opportunity to consider the ... claim and to correct that asserted constitutional defect in [his or her] conviction." *Picard v. Connor,* 404 U.S. 270, 275–76, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). A petitioner has "fairly presented" his claim if he has "informed the state court of both the factual and legal premises of the claim he asserts in federal court." *Daye v. Attorney General,* 696 F.2d 186, 191 (2d Cir.1982). Benjamin fairly presented his Sixth Amendment claims to the state court. On appeal to the Appellate Division, Benjamin argued that because a deadlocked jury was exposed to his prior criminal record, his rights to be tried by an impartial jury, to confront witnesses and to be afforded due process were violated. *See* Appellant Br. at 22–42, Ex. H to Simone Aff., at A139–59. The Appellate Division rejected his claims. *See Benjamin,* 709 N.Y.S.2d at 517 (holding that jury's exposure to petitioner's prior robbery arrest record contained in the inadequately redacted police report was not a ground for reversal). Benjamin also presented these claims to the Court of Appeals. *See* De Simone Letter at 1.

### B. Standard of Review

The AEDPA provides that a federal court can grant habeas corpus relief only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see also Williams v. Taylor,* 529 U.S. 362, 404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, J., plurality opinion).

Under the "contrary to" provision, a "federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the [Supreme Court] on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Id.* at 413, 120 S.Ct. 1495. Under the "unreasonable application" provision, a writ may be granted "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions, but unreasonably applies that principle to the facts of the prisoner's case." *Id.* "[U]nreasonable application of federal law is different from an incorrect application of federal law." *Id.* at 409, 120 S.Ct. 1495. "Some increment of incorrectness beyond error is required," *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000), but "the increment need not be great; otherwise habeas relief would be limited to state court decisions 'so far off the mark as to suggest judicial incompetence,'" *id.* (quoting *Matteo v. Superin-*

---

**8.** Petitioner also claims that his trial counsel provided ineffective assistance. *See* Pet. Mem. at 36–38. Petitioner contends that the following conduct by counsel was objectively unreasonable: (1) failing to adequately redact the police report containing a reference to petitioner's prior criminal record for two robbery arrests and a probationary sentence thereby causing the jury to be exposed to highly prejudicial, inadmissible evidence that directly led to his conviction; and (2) failing to call at trial three eyewitnesses to the crime who failed to pick petitioner out of a photo review or line-up. *See id.* at 37.

In his appeal to the Appellate Division, petitioner argued that his trial counsel's inadequate redaction amounted to ineffective assistance of counsel. *See* Defendant–Appellant's Br. at 29–30 n. 9.; App. to Pet. Mem. at 146–47. However, he failed to raise this claim of ineffective assistance of counsel to the Court of Appeals. *See* Letter by Joseph De Simone to Judge Albert M. Rosenblatt of August 15, 2000 ("De Simone Letter") at 1, Ex. K to Simone Aff., at A206. Therefore, while this claim may be deemed exhausted, it is procedurally barred. Accordingly, I will not address the merits of this claim.

*tendent, SCI Albion,* 171 F.3d 877, 889 (3d Cir.1999)).

## C. Analysis of Petitioner's Sixth Amendment Claim

"The Sixth Amendment guarantees criminal defendants the right to a trial by jury, including the right to confront one's accusers.... A defendant's Sixth Amendment rights are therefore implicated when the jury considers incriminating evidence that was not admitted at trial." *Bibbins v. Dalsheim,* 21 F.3d 13, 16 (2d Cir.1994). However, a determination that a "petitioner's Sixth Amendment rights have been violated by a jury's consideration of extra-record information is not sufficient to grant a writ of habeas corpus." *Loliscio v. Goord,* 263 F.3d 178, 185 (2d Cir.2001). A court must also find "beyond a reasonable doubt that this constitutional error was not harmless." *Id.* (citing *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)).

Benjamin claims that his rights were violated when the jury learned of his two prior robbery arrests and sentence of probation. To decide this claim, two questions must be answered: *First,* whether the inadequately redacted portion of the police report admitted as a defense exhibit was extrinsic evidence; and *second,* if so, whether this error was harmless. Because the answer to the first questions is "yes" and to the second one is "no," the writ must be granted.

### 1. Extrinsic Evidence

Generally, a jury verdict may not be impeached by proof of the tenor of its deliberations. *See Parker v. Gladden,* 385 U.S. 363, 364–65, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966). However, a court may inquire into the jury's deliberations where there is a showing of improper influence. *See id.* Both parties recognize that under the Sixth Amendment, a defendant has a right to a trial by jury and the right to confront his accusers. At the very least, this constitutional right mandates that the " 'evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel.' " *Loliscio,* 263 F.3d at 185 (quoting *Turner v. Louisiana,* 379 U.S. 466, 472–73, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965)). Therefore, when extraneous information finds its way into the jury room, a defendant's Sixth Amendment rights have been violated because the jury has been exposed to evidence not subjected to confrontation or cross-examination. *See id.*

The general rule is that if a jury learns of a defendant's bad character or other crimes outside the trial process, this constitutes prejudicial error. *See Parker,* 385 U.S. at 364, 87 S.Ct. 468 (reversing a conviction where a court bailiff made prejudicial statements about defendant's "wicked" character to certain sequestered jurors). *See also Marshall v. United States,* 360 U.S. 310, 312–13, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959) (reversing conviction where jury was exposed to newspaper articles containing reference to defendant's prior convictions where trial court had refused to permit the introduction of such evidence); *Michelson v. United States,* 335 U.S. 469, 476, 69 S.Ct. 213, 93 L.Ed. 168 (1948) ("The state may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors....").

■ The People contend, however, that the arrest portion of the insufficiently redacted police report was not extrinsic evidence because the report was admitted as a defense exhibit without restrictions. *See* Opp. Mem. at 18. The People make the following arguments: (1) petitioner offered the exhibit at issue into evidence as part of his cross-examination of Officer Ryan, and

(2) the exhibit in its entirety was duly admitted evidence because the record did not indicate that the report was to be redacted before being presented to the jury. Thus, the People conclude, the jury's examination of the inadequately redacted portion did not implicate petitioner's Sixth Amendment rights. *See id.* at 18–20.

The People's argument is not convincing. *First,* extrinsic information does not transform itself into admissible evidence simply because it is hidden within a properly admitted exhibit introduced into evidence without restrictions. *See, e.g., Eslaminia v. White,* 136 F.3d 1234, 1237 (9th Cir.1998) (finding that exposure of a jury to an inadequately redacted side of a tape containing an inadmissible interview was a "serious error of constitutional dimensions," notwithstanding that the tape was introduced into evidence without restrictions); *Farese v. United States,* 428 F.2d 178, 180 (5th Cir.1970) (holding that error occurred when $750 in large denominations, the existence of which was unknown to the government or defense, was discovered by the jury upon examination of a freshly laundered shirt inside an attache case introduced into evidence).[9]

Here, in a pretrial hearing, Benjamin's prior criminal convictions—a felony conviction for robbery and a misdemeanor conviction for assault—were explicitly held inadmissible except for purposes of impeachment by the government if Benjamin

chose to testify. *See* Tr. at 33–35. The mere fact that defense counsel approved of the police report in the form it was admitted does not deprive petitioner of his constitutional right not to have extrinsic information considered by the jury.

Moreover, the extraneous nature of the redacted portion does not change simply because the admitted evidence was a defense exhibit, or the redaction was performed by defense counsel. The settled law in this circuit is that it is the " '*nature* of the matter [discovered by the jury] and its probable effect on a hypothetical average jury,' not the *source* of the information . . . which determines whether [a] defendant has been prejudiced." *United States ex rel. Owen v. McMann,* 435 F.2d 813, 820 (2d Cir.1970) (Friendly, J.) (emphasis added) (quoting *United States v. Crosby,* 294 F.2d 928, 950 (2d Cir.1961)). *See also Doan v. Brigano,* 237 F.3d 722, 735 (6th Cir.2001) (quoting *McMann,* with approval, on habeas review of extrinsic evidence considered in juror deliberations); *Jeffries v. Wood,* 114 F.3d 1484, 1490 (9th Cir.1997) (citing *McMann* and holding that the source of the constitutional error during deliberations—unsworn testimony from a juror versus a court official—does not diminish the scope of defendant's Sixth Amendment rights). Whether the inadequately redacted document at issue here was a prosecution or defense exhibit is of no significance. In either case, the hidden and inadmissible information is contained

9. In another example, *Lacy v. Gabriel,* 567 F.Supp. 467 (D.Mass.1983), two "jail cards" were received into evidence, each bearing a photograph of the defendant. The picture on one card showed the defendant in prison clothes, with a jail identification number across his chest. The other card bore reference to bail amounts and to prisons in which the defendant had been previously incarcerated. Upon objection by the defense counsel, these prejudicial items were masked. *See id.* at 468. Six years after the guilty verdict, one

of the jurors revealed that during deliberations, "he had unmasked those excluded portions of [the jail cards], and that he and other jurors had discussed the excluded information prior to reaching their verdict." *Id.* Although the *Lacy* court ultimately denied the petition (because of the overwhelming evidence of guilt, including three positive identifications), the court found that the jury's consideration of the extrinsic evidence, *i.e.,* the unmasked portion of the exhibits, violated the petitioner's right of confrontation. *See id.* at 469.

in a duly admitted exhibit that both parties approved for receipt into evidence.

The fact that the redaction was performed by the defense counsel "without the knowledge or approval of the Court" does not alter the inadmissible nature of petitioner's prior criminal record. While defense counsel's decision not to inform the court of the redaction was certainly not wise, as Judge Berkman acknowledged, "[h]ad defense counsel requested a redaction the Court would have permitted it." Berkman Op. at 3. The important point is that the criminal record contained in the exhibit was redacted with the express intention that it be kept from the jury. Therefore, the inadequately redacted portion of the police report containing Benjamin's inadmissible prior robbery arrests and probationary sentence constitutes extrinsic evidence.

### 2. Prejudicial Effect

The next issue is whether petitioner has shown beyond a reasonable doubt that this constitutional error was not harmless. The issue is "not the mere fact of infiltration of some molecules of extra-record matter, with the supposed consequences that the infiltrator becomes a 'witness' and the confrontation clause automatically applies, but the nature of what has been infiltrated and the probability of prejudice." *McMann,* 435 F.2d at 818.

An objective test is used to assess the prejudicial effect on an average juror. *See Bibbins,* 21 F.3d at 17 (" 'Where an extraneous influence [on the jury] is shown, the [reviewing federal] court must apply an objective test, assessing for itself the likelihood that the influence would affect a typical juror.' ") (quoting *Miller v. United States,* 403 F.2d 77, 83 n. 11 (2d Cir.1968)); *see also United States v. Ianniello,* 866 F.2d 540, 544 (2d Cir.1989) (holding that the reviewing court must assess the effect of extra-record information on the hypo-

thetical average juror); *Mercado v. Portuondo,* No. 99 Civ. 12234, 2000 WL 1663437, at *11 (S.D.N.Y. Nov.3, 2000) ("In determining prejudice, the Court must apply an objective test, assessing for itself the likelihood that the [extra-record information] would affect a typical juror."). As discussed below, I find that the constitutional violation resulting from the jury's exposure to Benjamin's two prior robbery arrests and sentence of probation is not harmless beyond a reasonable doubt, *see Chapman,* 386 U.S. at 24, 87 S.Ct. 824, or alternatively, "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

At best, the People's case was thin. The prosecution rested entirely on the victim's identification. Wenglinsky had little opportunity (two minutes) to view his attacker, and most of that time was spent struggling with him. Moreover, Wenglinsky's descriptions of his assailant varied in the two police reports completed shortly after the incident and did not match petitioner's statistics in any event. Critically, at 5 foot 10 inches and 200 pounds, petitioner is of average height and of stocky build. Wenglinsky described a tall, thin assailant over 6 feet tall and weighing 170 pounds. *See* Tr. at 253–54, 295. After reporting the crime to the Manhattan Catch Unit, Wenglinsky skimmed through approximately 200 photographs in ten to fifteen minutes, and identified three to four men who looked like his assailant. He settled on Benjamin as the assailant only after being prodded by Officer Ryan. Because Wenglinsky had plenty of time to study Benjamin's photograph, his identification of Benjamin at the lineup and at trial is no surprise. In contrast, Brun and Alling, eyewitnesses at the crime scene, who did not view petitioner's photograph, were unable to identify petitioner in the same lineup that Wenglinsky viewed.

Furthermore, Nexon, also an eyewitness, failed to identify Benjamin from the photographs at the Manhattan Catch Unit.

Before the jury's improper consideration of Benjamin's prior criminal activity, they were deadlocked. They sent notes requesting: (i) all the exhibits, (ii) Wenglinsky's testimony regarding the descriptions he gave to the police, and (iii) all of alibi witness Jamal Wright's testimony. Thus, the deliberations appeared to focus on the reliability of Wenglinsky's identification and the trustworthiness of Benjamin's alibi. It is difficult to believe that learning that petitioner had two prior arrests for robbery and was sentenced to a term of probation for one of those robberies did not tip the scales unfairly against him and sway the jurors on both critical issues.

The People argue, however, that there was no evidence that the jury was affected by the exposure to Benjamin's prior arrest record. See Opp. Mem. at 29. The People contend that juror Hynes' affidavit failed to state that the extra-record information affected her verdict, nor did the letter contain "sufficient evidence to raise questions as to whether the verdict of other jurors was influenced." Opp. Mem. at 29–30. In addition, the People maintain that the letter did not "state that any juror used petitioner's prior arrest record to sway [his/her] vote." Id.

Petitioner counters that the People mistakenly applied a subjective standard to the prejudice analysis, rather than having assessed whether a reasonable juror would be prejudiced. See Rep. Mem. at 15. Although "'the trial court's post-verdict determination of extra-record prejudice must be an objective one, ... it may appropriately consider the circumstances surrounding introduction of that information in making such a determination.'" Loliscio, 263 F.3d at 189 (quoting United States v. Calbas, 821 F.2d 887, 896 n. 9 (2d Cir. 1987)).

In applying the objective standard to affirm the denial of federal habeas relief, the Loliscio court examined the surrounding circumstances and concluded that the jury's exposure to extraneous information had only negligible influence. See id. In that case, the defendant was convicted of second degree murder. During the deliberations, four jurors heard rumors about the defendant's prior bad acts, while the other eight did not. Two of the four jurors immediately sent a note and reported the incident to the court. See id. at 190. Subsequently, the trial judge charged the jury once again that their verdict was to be based solely on evidence admitted at trial, and that there should not be a rush to judgment following the introduction of rumors. See id. Furthermore, the jurors' note represented that all the jurors agreed that the rumors would not in any way bias them in reaching a verdict. Finally, the prosecution in Loliscio introduced "overwhelming" circumstantial evidence establishing defendant's guilt. See id.

The circumstances here are far different than in Loliscio. As juror Hynes stated in her letter, one juror read aloud the information about Benjamin's two prior robbery arrests and thereby shared the extra-record information with all the jurors. In Hynes' letter to the trial judge after the deliberations, she stated that "[t]his information seemed to influence some of the jurors, especially some who at that time were still undecided about the verdict." However, Hynes' telephone call to defense counsel, which preceded Hynes' letter, described what had transpired in the jury room in somewhat stronger terms: "as a result a number of jurors charged their verdict to guilty based on that information not in evidence." See Onofrio Aff. ¶ 6. Furthermore, the trial judge was unaware of the publication of the inadmissible information until after the guilty verdict was rendered, and therefore had no opportuni-

ty to give the jury a curative instruction to remedy the highly prejudicial nature of Benjamin's prior criminal record.

The prejudice caused by the extrinsic evidence was much greater than in *Loliscio*. *First*, rather than being exposed to vague rumors about Loliscio's prior bad acts, the extra-record information here was a police report detailing Benjamin's prior robbery arrests and his sentence of probation. *Second*, the extrinsic information in *Loliscio* came in the form of rumors, while in this case the highly prejudicial, inadmissible information came from an official police report, which carries much greater weight than unsubstantiated rumors. Finally, the People's case rested solely on the victim's eyewitness identification,[10] a far cry from the "overwhelming" evidence offered in *Loliscio*.[11]

The People argue that the jury could not have been prejudiced by the publication of Benjamin's prior criminal record because they had already learned from the cross-examination of Officer Ryan that the victim picked Benjamin's picture out of the Manhattan Catch Unit photo files, and thus their "common sense" would have alerted them that petitioner had a prior criminal history. *See* Opp. Mem. at 32–34. The People's contention is not persuasive. Case law dictates that testimony referring indirectly to previous criminal activity does not directly lead a jury to conclude that a defendant has a prior criminal history involving a virtually identical crime. For example, in *McCaskell v. Keane*, No. 97 Civ. 299, 2001 WL 840331, at *9 (S.D.N.Y. July 26, 2001), the court rejected the argument that a reference to picking defendant out of a photo array violated his constitutional rights by informing the jury of his prior encounters with the police. The court stated that "in general, testimony by police officers indicating that they had possession of a defendant's photograph is not enough to be prejudicial[.]" *Id.* at *8 (citing *United States v. Lanza*, 790 F.2d 1015, 1019 (2d Cir.1986)). The court based its decision, in part, on the fact that there was no express mention or suggestion that the defendant had a prior criminal record and there was no mention of potentially prejudicial terms, such as "mug shots." *See id.* at *9. Similarly, the New York Court of Appeals has stated that the presence of a defendant's photograph in a police file does not, in and of itself, lead to an inference by the jury that the defendant has a prior criminal record. *See People v. Mullin*, 41 N.Y.2d 475, 479, 393 N.Y.S.2d 938, 362 N.E.2d 571 (1977) (stating that admission of a police report into evidence, which contained the defendant's picture, did not directly place before the jury the fact that the defendant had a criminal record).

The People's reliance on *United States v. Gimelstob*, 475 F.2d 157 (3d Cir.1973), is

---

**10.** The Supreme Court " 'has recognized the inherently suspect qualities of eyewitness identification evidence.' " *Arizona v. Youngblood*, 488 U.S. 51, 73 n. 8, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988) (quoting *Watkins v. Sowders*, 449 U.S. 341, 350, 101 S.Ct. 654, 66 L.Ed.2d 549 (1981) (Brennan, J., dissenting)). *See also United States v. Wade*, 388 U.S. 218, 228, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (describing eyewitness identification evidence as "notoriously unreliable"); *Lyons v. Johnson*, 99 F.3d 499, 504 (2d Cir.1996) (acknowledging the "intrinsic unreliability" of eyewitness identifications" and considering the "improper suggestion" that results from

such identifications to be one of the greatest factors of "miscarriages of justice").

**11.** In *Loliscio*, "the prosecution introduced a considerable amount of circumstantial evidence tending to show that petitioner had murdered the victim" including: his lie to the police that he had not been with the victim on the night of the homicide, his attempt to create a false alibi, his altering of his appearance after the homicide, his vacuuming his car the day after the homicide, and his spontaneous statement to the police that "you don't have me good enough." *Loliscio*, 263 F.3d at 190.

misplaced. *See* Opp. Mem. at 33. In *Gimelstob*, a witness testified that the defendant's photo was "a mug-type photograph." 475 F.2d at 162. In addition, the jury saw the mug shot photo. Here, the actual photo array, including Benjamin's picture, was never entered into evidence and the jury never saw the photos. The jury merely heard testimony regarding the out-of-court photo identification, and there was no reference to a prior robbery conviction. While today's sophisticated jury might well have speculated, or perhaps realized, that the existence of petitioner's picture in the Manhattan Catch Unit is indicative of prior criminal history, such inference or speculation does not directly expose the jury to petitioner's prior criminal record in the way that the inadequately redacted portion of the police report did.

In sum, given that the prosecution's case against Benjamin was weak and that it relied primarily on Wenglinsky's identification, the publication to the jury during deliberations of Benjamin's two prior robbery arrests and a sentence of probation was not harmless error. Accordingly, the introduction of this extrinsic information into the jury deliberations sufficiently violated petitioner's Sixth Amendment rights such that a writ of habeas corpus must issue. .

### D. Application of Legal Standard

■  Having determined that Benjamin's Sixth Amendment rights were violated when the jury learned of his prior robbery arrests and probationary sentence and that such error cannot be deemed harmless beyond a reasonable doubt, the next step is to determine if the state court's decision is contrary to federal law.[12] In affirming petitioner's conviction, the Appellate Division stated:

> Defendant is not entitled to reversal based on the fact that the jury was able to see through an inadequately redacted portion of a police document and discover that he had been arrested previously for robbery. The document was entered into evidence by the defense counsel and there is nothing in the record to indicate that the document was meant to be redacted; the redaction was done without the knowledge or consent of the court or the prosecutor. The document was admitted without restrictions, and therefore, the jury could properly review it for all purposes.

*Benjamin,* 709 N.Y.S.2d at 517.

This excerpt reveals that the state court did not consider petitioner's Sixth Amendment rights to have been violated when the jury learned of his two prior robbery arrests and probationary sentence through the inadequately redacted exhibit. Unlike the trial court, the Appellate Division, having found no violation, did not proceed to analyze whether the alleged error was harmless.[13] Accordingly, the Appellate Di-

---

**12.** The state court opinion does not represent an unreasonable application of federal law. The unreasonable application prong applies only "if the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams,* 529 U.S. at 362, 120 S.Ct. 1495. Because the Appellate Division found no constitutional violation in the jury's reading of the poorly redacted exhibit, it failed to identify the relevant Supreme Court prece-

dent. Because the state court did not analyze or identify any federal law, the "unreasonable application" prong does not apply.

**13.** Judge Berkman, the trial judge, reasoned that "[e]ven assuming arguendo that the juror's perusal of the blacked out portion of the defense exhibit was improper, the defense has failed to establish 'the likelihood that prejudice would be engendered.'" Berkman Op. at 4 (quoting *People v. Brown,* 48 N.Y.2d 388,

vision's opinion is contrary to federal law in that it ignored the well-established principle that a defendant's Sixth Amendment rights are violated when a jury considers incriminating evidence not admitted at trial resulting in error that is not harmless.[14] *See Turner*, 379 U.S. at 472–73, 85 S.Ct. 546. Having satisfied the "contrary to" prong of the AEDPA standard, Benjamin's petition must be granted.

## IV. CONCLUSION

For the reasons stated above, the writ of habeas corpus is granted. The People are hereby directed to re-try Benjamin within 90 days from the date of this Order or release him from custody. The Clerk is directed to close this case.

394, 423 N.Y.S.2d 461, 399 N.E.2d 51 (1979)).

However, it is the highest state court decision to reach the merits that is subject to federal review. *See Peace v. Hall*, No. C 00–1072, 2002 WL 31689360 (N.D.Cal. Nov. 26, 2002) ("[F]ederal court review under § 2254(d) is of the last explained state court opinion to reach the merits.") (citing *Bains v. Cambra*, 204 F.3d 964, 970–71, 973–78 (9th Cir.2000)); *cf. Ylst v. Nunnemaker*, 501 U.S. 797, 801, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) ("If the last state court to be presented with a particular federal claim reaches the merits, it removes any [procedural] bar to federal-court review that might otherwise have been available.").

14. The trial court cited *Stein v. New York*, 346 U.S. 156, 178, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953), for the proposition that a verdict cannot be impeached by the effect of some juror's conduct on the mental processes of other jurors. *See* Berkman Op. at 4–5. However, petitioner does not argue here that the verdict should be impeached because a juror felt unduly pressured. Instead, petitioner argues that his conviction should be overturned because of the jury's impermissible consideration of extrinsic information. Accordingly, Judge Berkman's reference to *Stein* need not be addressed.